603 F.2d 791
 1979-1 Trade Cases 62,678
 SUNFLOWER ELECTRIC COOPERATIVE, INC., Plaintiff-Appellant,
v.
The KANSAS POWER AND LIGHT COMPANY, Central Kansas Power
Company, Central Telephone & Utilities
Corporation, and United
Telecommunications, Inc.,
Defendants-Appellees.
 No. 78-1188.
 United States Court of Appeals,
Tenth Circuit.
 Argued April 17, 1979.
Decided June 4, 1979.
On Motion for Rehearing Aug. 6, 1979.
 
 Wallace Edward Brand of Pearce & Brand, Washington, D. C. (Edward E. Hall of Pearce & Brand, Washington, D. C., on the brief), for plaintiff-appellant.
 Lawrence A. Rouse of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo. (Dick H. Woods of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., and Cosgrove, Webb & Oman, Topeka, Kan., on the brief), for defendant-appellee The Kansas Power and Light Co.
 Richard J. Rappaport of Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill. (Keith P. Schoeneberger of Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., of counsel and on the brief, Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., on the brief), for defendant-appellee Central Tel. & Utilities Corp.
 James M. Caplinger, Topeka, Kan., on the brief, for defendant-appellees United Telecommunications, Inc. and Central Kansas Power Co.
 Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The basic question in this case is whether the trial court was correct in its ruling that the primary jurisdiction of a Sherman Act case which was here presented was with the Federal Power Commission or whether or not the trial court should have proceeded to try the case. This cause has been languishing for a good many years and so we hasten to reach a decision in an effort to accelerate its progress.
 
 
 2
 The original complaint was filed on March 28, 1975, by the Sunflower Electric Cooperative, a Kansas cooperative corporation, which supplies low cost and reliable electricity, so it says, to its members. It further states that the defendant has combined and conspired to restrain and monopolize trade in the supply of firm bulk power in the power exchange market, such acts being in violation of both Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. It is further alleged that a proposed merger or acquisition of one of the parties defendant by another of the defendants constituted a violation of Section 1 of the Sherman Act.
 
 
 3
 The named defendants are Kansas Power and Light Company (KP&L), the Central Kansas Power Company (CKP), United Telecommunications, Inc. (United Tel-the corporate parent of CKP), and the Central Telephone Utilities Corporation (CTU). Plaintiff-appellant Sunflower is here referred to as Sunflower and the defendants-appellees are referred to by their respective titles or as the defendants. The proposed acquisition, which is alleged to be a violation of the antitrust laws, was of CKP by KP&L.
 
 
 4
 The judgment of the trial court was entered July 28, 1977. The court held that pursuant to the doctrine of primary jurisdiction, the antitrust action should be stayed pending the disposition of the merger or acquisition and other related issues in proceedings before the Federal Power Commission (FPC), now the Federal Energy Regulatory Commission, pursuant to the provisions of the Federal Power Act.[1]
 
 
 5
 It was from this basic order that Sunflower appealed. The district court found that Sunflower was engaged in selling wholesale electric energy to consumer members in northwest and southwest Kansas. As a result of circumstances not here present, in early 1970, Sunflower was in the position of having to purchase increasingly expensive oil in order to meet its requirements, or to purchase, from CTU, coordinating power in the power exchange market. Sunflower viewed these two sources as being unreliable and economically questionable and so brought suit alleging that the defendants had restricted the options available to it and in so doing had acted contrary to the antitrust laws.
 
 
 6
 Much of the trial court's opinion was concerned with the allegations as to Clayton Act violations and the possible significance of the fact that under the Federal Power Act the FPC is given authority to review mergers and acquisitions. Full reliance was placed on the case of Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1972), and the trial judge concluded that the action, strictly upon that basis, was to be stayed.[2]
 
 
 7
 In his memorandum order, the judge characterized the Sunflower cause by saying that while it made a claim for treble damages, which is obligatory in a federal antitrust action, that the true thrust of its prayer for relief was the demand that the court immediately undertake to resolve all of Sunflower's energy supply problems at little or no cost to its members. The trial court was apparently influenced by the fact that he had located no other case in which a court had found, within the Sherman and Clayton Acts, power to provide protection to a wholesale customer of electrical power and wherein the power to mandate or compel a public utility to wheel power was recognized. Several other reasons were enumerated by the trial court as favoring the decision to stay the action pending review by the FPC. The judge cited Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952) and Ricci, supra, involving the doctrine of primary jurisdiction, and found that in the case at bar there were present the factors identified by the Supreme Court as compelling a stay. These factors set forth by the district court were:
 
 
 8
 1) it (would be) necessary for the court to determine whether the federal antitrust statutes were inapplicable to the subject matter of the complaint by reason of a federal regulatory scheme incompatible with the maintenance of an antitrust action; (2) some facets of the dispute between the parties were arguably within the jurisdiction of the appropriate agency; and (3) adjudication of that dispute by the agency promised to be of material aid in resolving the immunity question. (Ricci ) 409 U.S. at 302, 93 S.Ct. 573.
 
 
 9
 Sunflower Electric Cooperative v. Kansas Power & Light, et al., # 75-37-C5, slip op. at 10 (D. Kan. July 28, 1977).
 
 
 10
 The court concluded that this was a case where the experience and expertise of an administrative agency in reviewing facts of a nature not conventionally dealt with by courts of general jurisdiction would be a useful foundation in a later court action. Agency expertise is, of course, a well-accepted and valid justification for staying an action in many situations. Moreover, the trial judge reasoned that the questions and issues raised were in an area where uniformity of approach was desirable, and that isolated or " sporadic action by federal courts," would be counterproductive.
 
 
 11
 The trial judge was not convinced that the fact that the FPC had no authority over antitrust claims in that it had no power to afford the relief sought, that is, the compelling of wheeling, the granting of treble damages, etc., required the total bypass of the administrative route. Instead, the trial court felt that this should be first heard and determined in administrative proceedings, relying upon Gulf States Utilities Company v. Federal Power Commission, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973). The further conclusion was that it was quite possible that the Federal Power Act removed some conduct from the antitrust laws; "(i)t is . . . arguable that at least with reference to some of the matters alleged in the plaintiff's complaint, the remedy afforded by the (Federal Power) Act if any supersedes that provided by the antitrust laws." In sum, the judge felt that this was a case which presented opportunities for taking advantage of the agency's expertise, saying that if the matter was not first referred to the FPC it was possible that the court would be unable to avail itself of that expertise at a later date. The court regarded as persuasive the fact that the FPC was not required to suspend its merger proceeding pending the outcome of the challenge to the merger in federal court, and that if one or the other of the proceedings was not stayed, that there was a risk of conflicting results.
 
 
 12
 The plaintiff relied heavily on Otter Tail Power Company v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), a 1973 decision which allegedly supported the plaintiff's position. However, notwithstanding that Otter Tail is similar on its facts, in respect to same issues, to the present case, the trial court regarded the earlier Ricci decision of the Supreme Court to be more relevant to the issues. We must disagree with the viewpoint which the trial court took.
 
 I.
 
 13
 DOES THE DOCTRINE OF PRIMARY JURISDICTION APPLY?
 
 
 14
 The named doctrine provides that where the law vests in an administrative agency the power to decide a controversy or treat an issue, the courts will refrain from entertaining the case until the agency has fulfilled its statutory obligation. See California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). When a federal court is presented with a case within its jurisdiction but which involves an issue within the competence of an administrative body in an independent proceeding, comity and avoidance of conflict as well as perhaps other considerations suggest propriety in referring the issue. See Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 254, 71 S.Ct. 692, 95 L.Ed. 912 (1951).
 
 
 15
 This action is justified on the basis that it achieves uniformity and consistency in the regulation of those businesses and activities with which Congress is concerned, and that the flexibility of the agency as compared to the rigidity of the court argues in favor of allowing the agency to proceed. The expertise of the agency is another argument which favors this. See Far East Conference v. United States, supra.
 
 
 16
 It is different from exhaustion. See United States v. Western Pacific R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). There, in Western Pacific, the court explained that the exhaustion doctrine requires that judicial action on a claim be withheld when the law provides that such claim may be treated first by the proper agency. In other words, the administrative process must be exhausted before the parties go to court. On the other hand, primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset, but it is likely that the case will require resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body. See 352 U.S. at 64, 77 S.Ct. 161. Where this is the situation, the court may suspend the action and refer the issues which lie within the ambit of the agency's responsibility to it in order to obtain its views and so as to reach a more informed and better decision.
 
 
 17
 The question then, boils down to whether the doctrine should be applied in the present situation. Are the issues such to promote the interest of "uniform and expert administration of the regulatory scheme"? See United States v. Western Pacific R. Co., 352 U.S. at 65, 77 S.Ct. at 166. Also to be considered are the countervailing policy considerations which urge disposition of the issues in a federal court of general jurisdiction.
 
 
 18
 The trial court, however, found the doctrines of primary jurisdiction and exhaustion required the action be stayed. In so doing it relied on Ricci v. Chicago Mercantile Exchange, supra, and distinguished Otter Tail Power Company v. United States, supra. And so, therefore, this court must determine which of these decisions govern here.
 
 
 19
 In Otter Tail, the United States brought a civil antitrust action against the power company. The district court held that the Otter Tail Power Company had attempted and had indeed maintained a monopoly over the retail distribution of electric power in the region it served, and had attempted, in some cases successfully, to prevent local communities from adopting a municipal distribution system upon the expiration of Otter Tail's distribution agreement with those communities. The court found that Otter Tail had, in order to effect its scheme, refused to sell wholesale power to communities to which it had been providing retail power and, particularly, had refused to wheel power to systems operated by the local communities, and had started legal actions with the object of further delaying establishment and impeding growth of the municipal distribution systems. Furthermore, it had managed to deny access to other suppliers to the communities involved as such access would have to have been obtained through Otter Tail's facilities.
 
 
 20
 Otter Tail contended, as have the defendants here, that the issues involved would be best handled by the FPC. The Supreme Court, however, disagreed. It is to be noted that in Otter Tail the government, not a private entity, brought the complaint, and also, there was nothing like the proposed merger found in the instant case to complicate matters.
 
 
 21
 The remedies sought in Otter Tail included requests to compel the power company to wheel power and provide power interconnects. The company urged strenuously that under § 202(b) of the Federal Power Act, 16 U.S.C. § 824a(b), the FPC had authority to compel involuntary interconnections of power and thus the trial court should defer action. However, the majority (this was a 4-3 decision) was not persuaded. It felt that the goal of § 202 was to foment voluntary power interconnects, and that
 
 
 22
 (o)nly if a power company refuses to interconnect voluntarily may the Federal Power Commission, subject to limitations unrelated to antitrust considerations, order the interconnection. The standard which governs its decision is whether such action is "necessary or appropriate in the public interest." Although antitrust considerations may be relevant, they are not determinative.
 
 
 23
 410 U.S. at 373, 93 S.Ct. at 1028.
 
 
 24
 The opinion reviewed the legislative history of the Federal Power Act and discovered no legislative intent to immunize or protect power utilities from the constraints of antitrust laws. Rather, it was the Court's opinion that Congress chose, rather than a comprehensive program seeking to regulate the distribution of power in the interstate market, to have the market operate on a voluntary commercial basis. The Court said:
 
 
 25
 these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws.
 
 
 26
 410 U.S. at 374, 93 S.Ct. at 1028.
 
 
 27
 The opinion, therefore, found nothing to indicate that there was a congressional intent, in giving the FPC limited authority in the power interconnect area, to immunize utilities from antitrust laws, at least in the area of refusing to deal with a municipal corporation. Furthermore, while there was limited authority vested in the Commission in the power interconnect area, there was no correlative authority to order wheeling vested in the Commission and, therefore, an order to wheel power, issued by the district court, in no way infringed on the authority of the FPC.
 
 
 28
 The case of Ricci v. Chicago Mercantile Exchange, supra, arose as a result of the suspension of Ricci by the Mercantile Exchange. He was a member and they transferred his membership, without notice, to another, Siegel Trading Company; a third party transferred his membership to another without giving him any notice. The complaint alleged that Ricci had purchased a membership in the Exchange in 1967, using funds borrowed from the Trading Company, and that in February 1969, the Exchange, at the instance of the Trading Company, transferred the membership to Siegel Trading Company, giving Ricci no hearing and without furnishing him with notice. It used a blank transfer authorization that had previously been invoked. Allegedly, this course of conduct violated both the rules of the Exchange and the Commodity Exchange Act and was pursuant to an unlawful conspiracy aimed at restraining the conduct of Ricci's business.
 
 
 29
 The Court of Appeals for the Seventh Circuit ruled that Ricci had an administrative remedy available to him before the Commission, which would involve alleging and proving that the membership was illegally forfeited, and that this was a more direct remedy than was the action in court under the antitrust laws. The Supreme Court affirmed this ruling of the Seventh Circuit. The basic judgment of the Supreme Court was that the remedy before the Commission was a more direct and more pinpoint remedy than that which was available in court. The Supreme Court said:
 
 
 30
 The adjudication of the Commission, if it is forthcoming, will be subject to judicial review and would obviate any necessity for the antitrust court to relitigate the issues actually disposed of by the agency decision. Cf. United States v. Philadelphia National Bank, 374 U.S. (321) at 353-354 (83 S.Ct. 1715, 10 L.Ed.2d 915); Federal Maritime Board v. Isbrandtsen Co., supra (356 U.S. 481) at 498-499 (78 S.Ct. 851, 2 L.Ed.2d 926). Of course, the question of immunity, as such, will not be before the agency; but if Ricci's complaint is sustained, the immunity issue will dissolve, whereas if it is rejected and the conduct of the Exchange warranted by a valid membership rule, the court will be in a much better position to determine whether the antitrust action should go forward. Affording the opportunity for administrative action will "prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court for the scope and meaning of the statute as applied to (these) particular circumstances."
 
 
 31
 409 U.S. at 306, 93 S.Ct. at 582.
 
 
 32
 Recently the Seventh Circuit had a case before it, Mishawaka v. Indiana & Michigan Electric Co., 560 F.2d 1314 (7th Cir. 1977), Cert. denied, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978). There the court found that the FPC had no primary jurisdiction over an alleged "price squeeze" where the defendant raised its wholesale price of power sold to competitors while retaining its own low retail price and thus it reduced the ability of its competitors to compete for some retail customers.
 
 
 33
 The Seventh Circuit's interpretation of the Supreme Court's decision in Otter Tail was that it allowed the district court to treat an antitrust claim and not stay the action "where there was only a potential conflict between the federal judicial decree and a future order of the Federal Power Commission." 560 F.2d at 1322. (Similarly, in the case at bar, once the merger issue is out of the way, the conflict is either potential or nonexistant. Under the terms of the Act as it existed in 1975, the FPC had no authority to compel wheeling of power or to order the coordinated development of power, and this is conceded by the defendants in the briefs.) The court read Otter Tail as voiding, at least as regarding the primary jurisdiction of the FPC, the Ricci proviso that where some of the issues involved are subject to agency jurisdiction the antitrust court should defer to that agency. Instead, the Seventh Circuit chose to rely on the rule stated in Otter Tail that there exists only potential conflict between federal court action and future action by the FPC, the court need not stay its hand.
 
 
 34
 There are other recent cases which give support to the Otter Tail decision. One of these is Cantor v. Detroit Edison Co., 428 U.S. 579, 596 n. 35, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In that case Mr. Justice Stevens noted that
 
 
 35
 Since our decision in Otter Tail Power Co. v. United States, supra, there can be no doubt about the proposition that federal antitrust laws are applicable to electrical utilities. Although there was dissent from the particular application of the statute in that case, there was no dissent from the basic proposition that such utilities must obey the federal antitrust laws.
 
 
 36
 428 U.S. at 596 n. 35, 96 S.Ct. at 3120 n. 35.
 
 II.
 
 37
 We now come to a consideration of the FPC's jurisdiction with respect to interstate transmission of electricity. We note at the outset that the merger proposal is not before this court, and at the same time the record reveals that it has been withdrawn, and so it is not part of this case. When the cause was before the district court, the merger question was present in the case and this gave more substance to a contention that the FPC had some jurisdiction in the premises. We, however, must proceed upon the basis of the facts before us and the act as it existed in 1975 when these proceedings were at the trial level. Unquestionably, the amendments which changed the character of the Commission cannot be effective because they have not been given any retroactive scope.
 
 
 38
 The Federal Power Commission is authorized to oversee transmission of electric power and the sale of wholesale electric power in interstate commerce. 16 U.S.C. § 824(b). The Federal Power Act includes provisions designed to encourage "voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, . . . " 16 U.S.C. § 824a(a); Otter Tail Power Company v. United States, 410 U.S. at 373. The Commission has the power under 16 U.S.C. § 824a(b), upon application, notice, and a hearing, to order power interconnections where the Commission finds such action "necessary or appropriate in the public interest . . . ." This last clause has been interpreted by the Supreme Court in Otter Tail as a grant of limited authority and not a clause which was "intended to be a substitute for, or to immunize (a power company) from, antitrust regulation for refusing to deal with municipal corporations." 410 U.S. at 374-75, 93 S.Ct. at 1028. On the other hand, the Commission's primary responsibility lies in the area of rates and charges. All rates and charges for the sale of such energy as is subject to the jurisdiction of the FPC are controlled by the Commission. The Commission may suspend rate changes, determine the just and reasonable rate that is to be charged and fix or establish such a rate. 16 U.S.C. § 824d(e), § 824e(a).
 
 
 39
 This latter provision requires the Commission to act where it finds a "rate, charge, or classification (to be) unjust, unreasonable, unduly discriminatory or preferential." It is contended that this latter provision authorizes the Commission to assume jurisdiction in the instant case. The argument is that the essence of much of Sunflower's complaint "consists of allegations that the defendants have refused to deal with Sunflower, except on unfair and discriminatory terms and have given undue preference and advantages to other electrical utilities." However, none of the allegations in the complaint deal with discriminatory rate practices.
 
 
 40
 In Conway Corporation v. Federal Power Commission, 167 U.S.App.D.C. 43, 510 F.2d 1264 (1975), Aff'd, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), it was noted that the provisions of the Act, §§ 824d and 824e, "expressly require the Commission to weigh discriminatory effects In rate proceedings." 510 F.2d at 1270 (emphasis added.) There the court held that the FPC could consider discriminatory practices involving Retail rates, over which technically it had no jurisdiction, in determining claims of discrimination grounded in the anticompetitive effects caused by differences between the retail and wholesale rates charged by the utility.
 
 
 41
 Although Conway approved FPC consideration of practices with respect to retail rates, it does not approve the exercise by FPC of authority in areas such as the wheeling of electrical power nor does it authorize the ordering of coordinated development or the award of attorneys' fees. We view Otter Tail Power Company, supra, as confirming the conclusion that such relief cannot, under the old law at least, be granted by the FPC. See also Richmond Power & Light v. Federal Energy Regulatory Commission, supra, which recognizes that the FPC has no explicit duty to remedy alleged discriminatory practices which do not involve rates and charges. Id. at 623 n. 53. See also National Association for the Advancement of Colored People v. Federal Power Commission, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976).
 
 
 42
 Looking then, at the extent of authority of the Commission in the light of Otter Tail Power Company and Richmond Power and Light, it is clear that the FPC lacked authority to deal with the problems which were present in the district court case. Looking back, in the light of present knowledge, the referral to the Commission was a futile move. We recognize that at the time the merger issue was present and so it did not look so futile.
 
 
 43
 Accordingly, we are constrained to conclude that the Federal Power Act, as it existed when this claim accrued, failed to provide a feasible administrative remedy which would justify the referral here, for as we view it it would have been merely a postponement of the day for coming to grips with the monopolizing issue.
 
 
 44
 We agree, then, with Sunflower's position that its remedy, if any, was pursuant to Sections 1 and 2 of the Sherman Act.
 
 
 45
 The judgment is reversed and the cause is remanded with directions to the trial court to proceed to the trial of the case on the merits.
 
 ON MOTION FOR REHEARING
 
 46
 Appellees have filed a motion for rehearing which calls attention to the fact that we did not, in our opinion, address the change of law which took place while the case was pending in our court.[1] They cite Bradley v. Richmond School Board, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973), and Adolph Coors Co. v. A & S Wholesalers, Inc., 561 F.2d 807, 809 (10th Cir. 1977).
 
 
 47
 In view of the fact that we did not consider the Bradley doctrine which was followed in Coors, we deem it appropriate that we give full consideration to this doctrine in the light of our particular facts. It is appropriate also to consider the change in the statute.
 
 
 48
 In Bradley, the district court awarded counsel fees for services rendered from March 10, 1970, to January 29, 1971. The award was made after the court had ordered into effect the non-interim desegregation plan which was approved. The Board appealed from that, and the appeal was pending when Congress enacted a provision in the Education Amendments of 1972, § 718 of Title VII of the Emergency School Aid Act, 20 U.S.C. § 1617, dealing with retroactive application to services rendered prior to enactment. The Supreme Court rejected the contention that a change in the law is to be given effect in a pending case only where that has been clearly stated by the Congress. The limitation on this rule was stated in Bradley as "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. In view of the presence here of manifest injustice as well as statutory direction or legislative history to the contrary, we conclude that the consideration of the Bradley doctrine does not change the result which was reached in our principal opinion.
 
 
 49
 It was in the Public Utility Regulatory Policies Act of 1978, P.L. 95-617, 16 U.S.C. § 2601, Et seq., (the 1978 Act), that the Federal Energy Regulatory Commission (FERC) was granted additional powers. This agency superseded the Federal Power Commission. It was empowered to order wheeling, whereas the Federal Power Commission had not enjoyed this. See 16 U.S.C. § 824j (section 203 of the Act). It was also authorized to order power interconnects. See 16 U.S.C. § 824i (section 202 of the Act). See the Appendix to this supplemental opinion for the text of these two provisions.
 
 
 50
 Among the remedies which are sought by Sunflower in this case are wheeling and power interconnects together with antitrust relief and attorneys' fees. Kansas Power and Light Company's argument is that the cause ought to be remanded to the district court with directions to transfer the entire case to the FERC for determination of the issues over which that agency has jurisdiction. It no doubt hopes to prevail on the wheeling and interconnect issues, whereby the remaining issues will be stifled.
 
 
 51
 The request seems highly reasonable on its face. Unfortunately, however, such a referral is fraught with problems.
 
 
 52
 The First question is whether or not it satisfies the Bradley rule, which provides that the old law will obtain where manifest injustice would result from an application of the new law.
 
 
 53
 A Second problem is that the provisions of the new law, read in connection with its legislative history, disclose that Congress intended that antitrust actions are to be heard by the Courts in the first instance. The amendments made by the 1978 Act do not give the FERC primary jurisdiction in cases of this character.[2]
 
 
 54
 The question is then whether a manifest injustice under Bradley, supra, would result from giving full effect to the revised provisions on a retroactive basis.
 
 
 55
 What is meant by the term "manifest injustice?" In this case the plaintiffs filed their action in 1975. Since then they have encountered every kind of delay known to man and to the law and now they face still further delay. If this matter is referred to the FERC, it may well be that once the Commission hears the case they will have a satisfactory hearing and justice will be properly administered. When will that be? It is impossible to make a prediction, but we can take notice of the fact that the Commission has a backlog, as do the courts. Also, Sunflower will find itself at the end of a new waiting line. There is an important difference between courts and administrative tribunals. We can order the district court to expedite these proceedings and thus it would be advantageous for Sunflower to be before the district court. Moreover, it seems unreasonable to divide the case up and have the Federal Power Commission exercise, if it can, its new authority with respect to wheeling and power interconnects while having the district court consider the antitrust claims.[3] It appears more economical all around for one tribunal to hear and consider the entire case. This is more likely to produce not only a just result but a more expeditious handling of the entire matter. Certainly, "manifest justice" would be served by proceeding in this way, and it follows that manifest injustice would result if we were to allow the case to be cut up or to languish in its entirety before the Commission. The Commission would have no discretion to give relief in the area of antitrust violations. It would be compelled to return that part of the case to the court.
 
 
 56
 The Fourth Circuit has held that "(d)ivestiture of (a) matured right is a type of manifest injustice which the exception is designed to prevent." See Coe v. Secretary of Health, Education and Welfare, 502 F.2d 1337, 1340 (4th Cir. 1974). It seems plain that a manifest injustice occurs when the application of a new law divests a party of a vested right or results in a violation of due process. At bar Sunflower seeks treble damages under the antitrust laws, injunctive relief in the form of wheeling and power interconnects, and attorneys' fees. It is possible that it would not be deprived of its rights in this regard if the matter were to be transferred to the Commission. It is certain, however, that they would suffer delay and a hazard of complete denial because a delay of this kind is frequently critical.
 
 
 57
 Finally, Congress has shown its intention on many occasions that antitrust actions are to be tried by courts and that jurisdiction is to be retained not only over the antitrust actions but all related matters. Indications of such congressional intent are present in the 1978 Act. It is established in § 4, 16 U.S.C. § 2603, that "(n)othing in this Act or in any amendment made by this Act affects (1) the applicability of the antitrust laws to any electric utility or gas utility . . . ." This is designed to insure that the courts will retain jurisdiction over the case even if wheeling and power interconnects are among the remedies sought. This is set forth clearly in the Conference Report, which reads in pertinent part as follows:
 
 
 58
 The conferees intend to preserve the jurisdiction of the Federal and State courts in actions under antitrust laws, whether or not the parties to such actions could have sought remedies under this legislation.
 
 
 59
 Specifically with regard to certain authorities to order interconnections and wheeling under title II, It is not intended that the courts defer actions arising under the antitrust laws pending a resolution of such matters by the Federal Energy Regulatory Commission. The conferees specifically intend to preserve jurisdiction of Federal and State courts to resolve, independent of the Commission, such actions, including for example, cases where a refusal to wheel electric energy is alleged to be in violation of such laws. The court should be able to act whether or not action by the Commission under the provisions in title II can be requested or would be justified. In this way, The courts have jurisdiction to proceed with antitrust cases without deferring to the Commission for the exercise of primary jurisdiction.
 
 
 60
 H.R.Cong.Rep. # 95-1750, 95th Cong.2d Sess. 68, Reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 7659, 7802 (emphasis added). Thus, even if we apply the new Act, the FERC has no primary jurisdiction in an antitrust case, even if injunctive relief, in the form of wheeling or power interconnections, is sought.
 
 
 61
 In sum, then, whether we consider the exceptions contained in Bradley to the rule that present law shall be applied, or in the light of the provisions of the new Act from which it is apparent that the FERC is lacking in primary jurisdiction over the case, there is no escape from the conclusion that the cause must be heard by the district court.
 
 
 62
 Accordingly, rehearing is granted for the purpose of considering the matters raised in the motion for rehearing.
 
 
 63
 The judgment based upon the original opinion and the supplemental opinion is final, and the motion for rehearing and the motion for rehearing en banc are fully disposed of.
 
 APPENDIX
 
 64
 Sections 824i and 824j are set out below as they appear in Title 16 of United States Code Annotated.
 
 
 65
 S 824i. Interconnection authority Powers of Commission; application by state regulatory authority
 
 
 66
 (a)(1) Upon application of any electric utility, Federal power marketing agency, qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring
 
 
 67
 (A) the physical connection of any cogeneration facility, any small power production facility, or the transmission facilities of any electric utility, with the facilities of such applicant.
 
 
 68
 (B) such action as may be necessary to make effective any physical connection described in subparagraph (A), which physical connection is ineffective for any reason, such as inadequate size, poor maintenance, or physical unreliability,
 
 
 69
 (C) such sale or exchange of electric energy or other coordination, as may be necessary to carry out the purposes of any order under subparagraph (A) or (B), or
 
 
 70
 (D) such increase in transmission capacity as may be necessary to carry out the purposes of any order under subparagraph (A) or (B).
 
 
 71
 (2) Any State regulatory authority may apply to the Commission for an order for any action referred to in subparagraph (A), (B), (C), or (D) of paragraph (1). No such order may be issued by the Commission with respect to a Federal power marketing agency upon application of a State regulatory authority.
 
 
 72
 Notice, hearing and determination by Commission
 
 
 73
 (b) Upon receipt of an application under subsection (a) of this section, the Commission shall
 
 
 74
 (1) issue notice to each affected State regulatory authority, each affected electric utility, each affected Federal power marketing agency, each affected owner or operator of a cogeneration facility or of a small power production facility, and to the public.
 
 
 75
 (2) afford an opportunity for an evidentiary hearing, and
 
 
 76
 (3) make a determination with respect to the matters referred to in subsection (c) of this section.
 
 Necessary findings
 
 77
 (c) No order may be issued by the Commission under subsection (a) of this section unless the Commission determines that such order
 
 
 78
 (1) is in the public interest,
 
 
 79
 (2) would
 
 
 80
 (A) encourage overall conservation of energy or capital,
 
 
 81
 (B) optimize the efficiency of use of facilities and resources, or
 
 
 82
 (C) improve the reliability of any electric utility system or Federal power marketing agency to which the order applies, and
 
 
 83
 (3) meets the requirements of section 824k of this title.Motion of Commission
 
 
 84
 (d) The Commission may, on its own motion, after compliance with the requirements of paragraphs (1) and (2) of subsection (b) of this section, issue an order requiring any action described in subsection (a)(1) of this section if the Commission determines that such order meets the requirements of subsection (c) of this section. No such order may be issued upon the Commission's own motion with respect to a Federal power marketing agency.
 
 Definitions
 
 85
 (e)(1) As used in this section, the term "facilities" means only facilities used for the generation or transmission of electric energy.
 
 
 86
 (2) With respect to an order issued pursuant to an application of a qualifying cogenerator or qualifying small power producer under subsection (a)(1) of this section, the term "facilities of such applicant" means the qualifying cogeneration facilities or qualifying small power production facilities of the applicant, as specified in the application. With respect to an order issued pursuant to an application under subsection (a)(2) of this section, the term "facilities of such applicant" means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the application. With respect to an order issued by the Commission on its own motion under subsection (d) of this section, such term means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the proposed order.
 
 
 87
 Pub.L. 95-617, Title II, § 202, Nov. 9, 1978, 92 Stat. 3135.
 
 
 88
 Legislative History. For legislative history and purpose of Pub.L. 95-617, see 1978 U.S.Code Cong. and Adm.News, p. 7659.
 
 
 89
 S 824j. Wheeling authority Transmission service by any electric utility; notice, hearing and findings by Commission
 
 
 90
 (a) Any electric utility or Federal power marketing agency may apply to the Commission for an order under this subsection requiring any other electric utility to provide transmission services to the applicant (including any enlargement of transmission capacity necessary to provide such services). Upon receipt of such application, after public notice and notice to each affected State regulatory authority, each affected electric utility, and each affected Federal power marketing agency, and after affording an opportunity for an evidentiary hearing, the Commission may issue such order if it finds that such order
 
 
 91
 (1) is in the public interest,
 
 
 92
 (2) would
 
 
 93
 (A) conserve a significant amount of energy,
 
 
 94
 (B) significantly promote the efficient use of facilities and resources, or
 
 
 95
 (C) improve the reliability of any electric utility system to which the order applies, and
 
 
 96
 (3) meets the requirements of section 824k of this title.
 
 
 97
 Transmission service by sellers of electric energy for
 
 
 98
 resale; notice, hearing and determinations by Commission
 
 
 99
 (b) Any electric utility, or Federal power marketing agency, which purchases electric energy for resale from any other electric utility may apply to the Commission for an order under this subsection requiring such other electric utility to provide transmission services to the applicant (including any increase in transmission capacity necessary to provide such services). Upon receipt of an application under this subsection, after public notice and notice to each affected State regulatory authority, each affected electric utility, and each affected Federal power marketing agency, and after affording an opportunity for an evidentiary hearing, the Commission may issue such an order if the Commission determines that
 
 
 100
 (1) such other electric utility has given actual or constructive notice that it is unwilling or unable to provide electric service to the applicant and has been requested by the applicant to provide the transmission services requested in the application under this subsection, and(2) such order meets the requirements of section 824k of this title.
 
 
 101
 Preservation of competitive relationships; replacement of
 
 
 102
 electric energy; inconsistent state laws
 
 
 103
 (c)(1) No order may be issued under subsection (a) of this section unless the Commission determines that such order would reasonably preserve existing competitive relationships.
 
 
 104
 (2) No order may be issued under subsection (a) or (b) of this section which requires the electric utility subject to the order to transmit, during any period, an amount of electric energy which replaces any amount of electric energy
 
 
 105
 (A) required to be provided to such applicant pursuant to a contract during such period, or
 
 
 106
 (B) currently provided to the applicant by the utility subject to the order pursuant to a rate schedule on file during such period with the Commission.
 
 
 107
 (3) No order may be issued under the authority of subsection (a) or (b) of this section which is inconsistent with any State law which governs the retail marketing areas of electric utilities.
 
 
 108
 (4) No order may be issued under subsection (a) or (b) of this section which provides for the transmission of electric energy directly to an ultimate consumer.
 
 
 109
 Termination or modification of order; notice, hearing and
 
 
 110
 findings of Commission; contents of order;
 
 
 111
 inclusion in order of terms and
 
 
 112
 conditions agreed upon by parties
 
 
 113
 (d)(1) Any electric utility ordered under subsection (a) or (b) of this section to provide transmission services may apply to the Commission for an order permitting such electric utility to cease providing all, or any portion of, such services. After public notice, notice to each affected State regulatory authority, each affected Federal power marketing agency, and each affected electric utility, and after an opportunity for an evidentiary hearing, the Commission shall issue an order terminating or modifying the order issued under subsection (a) or (b) of this section. If the electric utility providing such transmission services has demonstrated, and the Commission has found, that
 
 
 114
 (A) due to changed circumstances, the requirements applicable, under this section and section 824k of this title, to the issuance of an order under subsection (a) or (b) of this section are no longer met, or
 
 
 115
 (B) any transmission capacity of the utility providing transmission services under such order which was, at the time such order was issued, in excess of the capacity necessary to serve its own customers is no longer in excess of the capacity necessary for such purposes.
 
 
 116
 No order shall be issued under this subsection pursuant to a finding under subparagraph (A) unless the Commission finds that such order is in the public interest.
 
 
 117
 (2) Any order issued under this subsection terminating or modifying an order issued under subsection (a) or (b) of this section shall
 
 
 118
 (A) provide for any appropriate compensation, and
 
 
 119
 (B) provide the affected electric utilities adequate opportunity and time to
 
 
 120
 (i) make suitable alternative arrangements for any transmission services terminated or modified, and
 
 
 121
 (ii) insure that the interests of ratepayers of such utilities are adequately protected.
 
 
 122
 (3) No order may be issued under this subsection terminating or modifying any order issued under subsection (a) or (b) of this section if the order under subsection (a) or (b) of this section includes terms and conditions agreed upon by the parties which
 
 
 123
 (A) fix a period during which transmission services are to be provided under the order under subsection (a) or (b) of this section, or
 
 
 124
 (B) otherwise provide procedures or methods for terminating or modifying such order (including, if appropriate, the return of the transmission capacity when necessary to take into account an increase, after the issuance of such order, in the needs of the electric utility subject to such order for transmission capacity).
 
 Definitions
 
 125
 (e) As used in this section, the term "facilities" means only facilities used for the generation or transmission of electric energy.
 
 
 126
 Pub.L. 95-617, Title II, § 203, Nov. 9, 1978, 92 Stat. 3136.
 
 
 127
 Legislative History. For Legislative history and purpose of Pub.L. 95-617, see 1978 U.S.Code Cong. and Adm.News, p. 7659.
 
 
 
 [1]
 In the recent legislation in which the Department of Energy was created, 42 U.S.C.A. § 7101, et seq., the Congress created the Federal Energy Regulatory Commission, 42 U.S.C.A. § 7171, and transferred thereto the powers and duties of the Federal Power Commission. 42 U.S.C.A. § 7172. However, the law was to be effective only on a date 120 days after the new Secretary of Energy assumed office and as the new law was passed on August 4, 1977, with no provisions for retroactivity, the transfer of power has no effect on this case (in fact, by Executive Order # 12009, 42 Fed.Reg. 46267 (September 13, 1977), the President established the first of October as the effective date of the Act.)
 In the new Public Utility Regulatory Policies Act of 1978, P.L. 95-617, the Federal Power Act was amended to grant to the FERC authority to order wheeling of power or power interconnections, upon application, where the Commission finds such an order to be in the public interest. 16 U.S.C.A. §§ 824i and 824j. Located in the conference report to the new law is a statement which sets out the understanding of present law held by the legislators, and how they intended the new law to be applied in the antitrust area:
 The conferees intend to preserve the jurisdiction of the Federal and State courts in actions under antitrust laws, whether or not the parties to such actions could have sought remedies under this legislation.
 Specifically with regard to certain authorities to order interconnections and wheeling under title II, it is not intended that the courts defer actions arising under the antitrust laws pending a resolution of such matters by the Federal Energy Regulatory Commission. The conferees specifically intended to Preserve jurisdiction of Federal and State courts to resolve, independent of the Commission, such actions, including for example, cases where a refusal to wheel electric energy is alleged to be in violation of such laws. The court should be able to act whether or not action by the Commission under the provisions in title II can be requested or would be justified. In this way, the courts have jurisdiction to proceed with antitrust cases without deferring to the Commission for the exercise of primary jurisdiction.
 H.R.Conf.Rep. # 95-1750, 95th Cong. 2d Sess., 68 Reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 7659, 7802. (Emphasis added.)
 It would seem that at least the authors of the conference report understood current case law to permit the courts to entertain the antitrust action, when relief such as is here involved is sought, without deferring to the regulatory body. Indeed, it would appear that they wholly approved of this approach.
 
 
 [2]
 Section 203(a) of the Federal Power Act, 16 U.S.C.A. § 824b(a), holds:
 No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so. * * *
 
 
 [1]
 Specifically, the enactment of the Public Utility Regulatory Policies Act of 1978, P.L. 95-617, in which the Federal Energy Regulatory Commission was granted certain additional powers. As noted in footnote 1 to the original opinion, the Act in which the Department of Energy was created, the Department of Energy Organization Act, 42 U.S.C.A. § 7101, Et seq., created the Federal Regulatory Energy Commission and transferred thereto certain powers and functions which had been exercised by the Federal Power Commission. 42 U.S.C.A. § 7171 and 42 U.S.C.A. § 7172(a)
 
 
 [2]
 We have not overlooked the fact that there is some indication in the Conference Report from which it can be argued that the Congress did not intend for the FERC to exercise the wheeling power retroactively. In view of the position that we have taken in the first and second points and the discussion which follows, and in view of the fact that the issue of retroactivity or prospectiveness is not expressly before us, it is unnecessary for us to decide this issue
 
 
 [3]
 The district court held, below, that it would, pursuant to the primary jurisdiction doctrine, have to hold the antitrust issues in abeyance pending the Commission's disposition of that part of the case over which the court felt the Commission had jurisdiction. This bifurcated procedure would, as appellees are well aware, result in further delay