Walt SHINAULT, Plaintiff,

v.

AMERICAN AIRLINES, INC., a Delaware Corporation and AMR Services Corporation, a Delaware Corporation, Defendants.

Civ. A. No. J89–0254(B).

United States District Court, S.D. Mississippi, Jackson Division.

May 25, 1990.

---

Jeffrey P. Hubbard, Wells, Moore, Simmons, Stubblefield & Neeld, Jackson, Miss., for plaintiff.

David A. Barfield, Satterfield & Allred, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on the Motion of the Defendants for Summary

Judgment pursuant to rule 56 of the Federal Rules of Civil Procedure. The Plaintiff has responded to the Motion, and the Court, having considered the Motion and response, together with memoranda of authorities and attachments thereto, makes the following findings of facts and conclusions of law.

## FACTUAL BACKGROUND

The Plaintiff is a thirty-year-old quadriplegic who lives in Jackson, Mississippi, and works as a stock broker. In 1989, the Plaintiff was chosen to be the 1989 National Easter Seals Adult Representative, and traveled frequently in order to promote disability awareness and to raise funds for the National Easter Seals Society.

In connection with his status as National Easter Seals Adult Representative, Plaintiff was invited to visit the White House on February 15, 1989. Plaintiff and his travel companion, Jeff Covington,. chose to fly with the Defendant American Airlines. Their original flight itinerary for the return trip to Jackson on February 16 was as follows:

| | | | |
|---|---|---|---|
| Flight 605 | Leave | Washington, D.C. | 1:08 p.m. |
| Flight 605 | Arrive | Nashville, Tenn. | 2:00 p.m. |
| Flight 1019 | Leave | Nashville, Tenn. | 2:42 p.m. |
| Flight 1019 | Arrive | Jackson, Miss. | 3:52 p.m. |

Due to mechanical difficulties, flight 605 was delayed. Actual departure time from Washington was 1:40 p.m. Additional delays were encountered due to bad weather, causing flight 605 to arrive in Nashville forty-five minutes late, or three minutes after flight 1019 was due to leave. At least twice during flight 605, Plaintiff expressed to the Defendant's flight attendant that it was imperative for the Plaintiff to arrive in Jackson on time because he had a press conference scheduled at the Jackson airport.

Upon arriving in Nashville, Plaintiff requested that he immediately be allowed to leave the plane, but was not allowed to do so until the other passengers had deplaned pursuant to the policy of the Defendant regarding handicapped passengers. After the other passengers had deplaned, American's Special Services agent brought a gurney onto the plane and the Plaintiff was transferred from his seat to the gurney, which was equipped with a seat belt. In order to save time, the Plaintiff requested that he be allowed to remain on the gurney, rather than be transferred to a low-back, manual wheelchair without seat belts, shoulder harnesses or other restraining devices, for the trip to the connecting gate. This request was denied as being against the Defendant's policy.

Meanwhile, flight 1019 was also delayed, and was scheduled to depart at 3:00 p.m. Plaintiff testified that the time which elapsed from the first passenger deplaning flight 605 until the Plaintiff arrived at the connecting gate was twelve minutes, and that flight 1019 did not depart until at least 15 minutes after flight 605 began deplaning. Thus, according to the Plaintiff's testimony, he had enough time to board flight 1019, and he asserts that but for the intentional discrimination of the Defendant against him because of his handicap, he would have been able to board that flight.

Anita Appleton, a gate agent with American Airlines, was working down the jetbridge at the gate from which flight 1019 left Nashville. Her recollection of the events surrounding the departure of flight 1019 was that at some point in time, she was ready to shut the door of the aircraft, but the zoner called and advised her that there were some late passengers. After those passengers were seated, Ms. Appleton closed the door, pulled the jetbridge away from the aircraft and called the planner to let him know that she was off the aircraft. The zoner called Ms. Appleton again and advised that she had more passengers to board. Because it was nearing departure time, she had to contact the planner to get authority to pull the jetbridge back up to the aircraft. After those passengers came on board, Ms. Appleton once again closed the door and pulled back the jetbridge. Shortly before departure, Ms. Appleton was approached by a member of the ground crew with some paper work for the captain. Ms. Appleton again obtained permission to extend the jetbridge, and after delivering the paperwork, again closed the door and pulled the jetbridge back.

She was met on the jetbridge by her replacement, Susan Capp. According to Appleton, within two minutes the plane had left. Appleton denies any recollection of Shinault and Covington at all.

The Plaintiff alleges that when he and Covington arrived at the departure gate of flight 1019, the plane was still at the gate and the door from the concourse to the jetbridge was open and the light was on. There were no other passengers in the area. According to Plaintiff and Covington, the Defendant's agent Ken Barry refused to allow the Plaintiff to board, stating that the flight had already left or that they had missed it. Covington then walked to the window near the gate and noticed that plane was still on the tarmac. He returned and told Barry that the plane was still there and that the door to the jetbridge was still open. In response, Barry stated "wait a minute" and began typing on a computer. Barry admitted in deposition testimony that typing on the computer could have in no way aided Plaintiff in boarding the flight. At this time, Ms. Appleton emerged from the jetbridge, switched off the lights and closed the door. Ken Barry asked her whether the plane had left yet. She responded, depending on whose testimony is believed, either that the plane had not departed, or that she had just closed the door. Barry and Appleton then walked down the jetbridge briefly. When they returned Barry informed the Plaintiff and Covington that he was sorry but would determine when the next flight was available. Covington went to the window and noticed the plane backing out on the tarmac. Barry allegedly does not recall Shinault or Covington, or the particular flight at all.

Immediately after learning that he had missed his flight, Shinault inquired about his personal wheelchair, and learned that it had made the connecting flight. Shinault claims that as a result, he was forced to remain in the strapless, low-back, manual wheel chair, although he admitted that he never asked for different accommodations. The next available direct flight to Jackson was not due to leave Nashville for another five hours. The only alternative was a flight to Jackson via Dallas, Texas, which would only save thirty minutes. Plaintiff chose for reasons of personal convenience to wait for the direct flight.

During his five hour wait, Plaintiff remained in the manual wheel chair. Because quadriplegics have no balance below the neck and cannot catch themselves if they begin to fall forward, the Plaintiff kept his head propped back against a wall for approximately five hours. For this and other reasons, the Plaintiff became extremely concerned about the effect the long delay without his personal wheelchair would have on his health. Some of his worries included fear that the delay in performing his bowel program could either cause him to experience dysreflexia and eventually a stroke, or either have a sudden bowel movement, that sudden muscle spasms would cause him to fall out of the wheelchair, and that the manual chair would cause him to develop pressure sores. None of these contingencies in fact occurred.

After complaining to the Defendant's executive office without satisfactory results, the Plaintiff filed this suit pursuant to the Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C.App. § 1374(c). The Plaintiff seeks the following relief:

a. a court order requiring the Defendants to implement rules, regulations and training procedures requiring officers, managers, agents and employees of American Airlines to properly comply with the ACAA as it relates to handicapped and disabled persons,

b. a court order requiring Defendants to provide access to wheelchairs equipped with seat belts and other safety devices,

c. an award of compensatory damages for the health risks incurred by Plaintiff in an amount not less than $250,000.00,

d. an additional award of damages for the humiliation, disgrace, annoyance, embarrassment, mental anguish and emotional distress incurred by Plaintiff in an amount not less than $250,000.00,

e. an award of punitive damages in an amount not less than $5,000,000.00,

f. an award of a reasonable attorney's fee plus expenses and court costs, and

g. such other and further relief as the Court deems just and proper.

## THE LAW

■ The ACAA states as follows:

(1) No air carrier may discriminate against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation.

(2) For the purpose of paragraph (1) of this subsection the term "handicapped individual" means any individual who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded has having such an impairment.

49 U.S.C.App. § 1374(c). This law, which amends section 404 of the Federal Aviation Act of 1958, was enacted on October 2, 1986, in direct congressional response to the ruling of the Supreme Court in *United States Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), wherein the Court held that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, only applied to those commercial airlines receiving direct federal subsidies. *See* S.Rep.No. 400, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2328, 2328–30. Furthermore, the Act responds to congressional concern about leaving "handicapped air travelers subject to the possibility of discriminatory, inconsistent and unpredictable treatment on the part of air carriers. *Id.*, at 2, 1986 U.S.Code Cong. & Admin.News at 2329–30.

Section 3 of the Act states that within 120 days of passage, "the Secretary of Transportation shall promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers." To date, no such regulations have been promulgated, although an advisory committee for regulatory negotiation has been appointed and has met with Department of Transportation Officials, and Proposed Rules have been issued. *See* 53 Fed.Reg. 23,574–23,601 (1988).

In *Tallarico v. Trans World Airlines, Inc.*, 693 F.Supp. 785, 788–89 (E.D.Mo. 1988), *aff'd in part, rev'd in part*, 881 F.2d 566 (8th Cir.1989), the only case construing the ACAA, the district court, applying the analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), held that the ACAA does imply a private right of action. That holding was affirmed by the United States Court of Appeals for the Eighth Circuit. The jury awarded the plaintiff $1,350.00 as out-of-pocket damages for TWA's refusal to permit her to board its aircraft and $78,650.00 as damages for emotional distress. Relying upon cases construing Title VII, the Age Discrimination in Employment Act ("ADEA"), and the Rehabilitation Act, the district court granted a j.n.o.v. with regard to the emotional distress claims, holding that as an anti-discrimination law, the ACAA did not provide for recovery of emotional distress damages. The Eighth Circuit reversed. The appeals court reasoned that because the ACAA, unlike the Rehabilitation Act, ADEA or Title VII, does not provide a remedial scheme, evidence of a congressional intent to exclude emotional distress damages does not exist. The court believed that the purpose and operation of the ACAA are more closely analogous to 42 U.S.C. § 1983 than to Title VII, the ADEA or the Rehabilitation Act. This Court disagrees with the Court of Appeals for the Eighth Circuit and agrees with the district court's opinion in *Tallarico*.

It is clear from the legislative history that the ACAA was promulgated in response to the decision of the Supreme Court in *Paralyzed Veterans* which declined to extend coverage under the Rehabilitation Act to private air carriers. It is therefore difficult to imagine that Congress intended to provide remedies of a different nature under the ACAA than are recoverable under section 504 of the Rehabilitation Act. The Rehabilitation Act is, in turn, enforced through Title VI. 29 U.S.C. § 794(a). In this connection the United

States Court of Appeals for the Fifth Circuit has at least suggested that in order to recover damages for violations of section 504 of the Rehabilitation Act, a plaintiff must allege and prove that the adverse action taken was intentional, that is, the result of a discriminatory animus. *Carter v. Orleans Parish Public Schools*, 725 F.2d 261, 264 (5th Cir.1984); *Marvin H. v. Austin Independent School Dist.*, 714 F.2d 1348, 1357 (5th Cir.1983). Even assuming that the Plaintiff has met that burden and that monetary relief is generally available under section 504, and therefore under the ACAA, the question of what kind of monetary relief is available must be addressed.

In *Drayden v. Needville Independent School District*, 642 F.2d 129 (5th Cir. 1981), an employment discrimination case brought under Title VI, the Fifth Circuit stated, without elaboration, that the right of action under Title VI "does not include the right to recover back pay or other losses." *Id.* at 133. Subsequently, however, the Supreme Court specifically addressed the nature of the remedies available under section 504, holding that a plaintiff alleging intentional discrimination may bring an action for back pay. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). Thus, the sweeping prohibition of *Drayden* against all monetary relief under Title VI no longer applies.

In *Guardians Association v. Civil Service Commission of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), Justice White mustered enough votes to affirm the opinion of the Seventh Circuit Court of Appeals. Although unable to agree on an opinion, five members of the Court did at least imply that some form of monetary relief might be available under Title VI to remedy intentional discrimination. The monetary relief awarded by the lower court in *Guardians*, however, was back pay and benefits, not general damages. *Guardians* can be read to say that only awards in the nature of back pay can be recovered. *See Bradford v. Iron County C–4 School Dist.*, 37 Empl.Prac.Dec. (CCH) ¶ 35,404 (E.D.Mo.1984) (term "compensatory damages" as used in *Guardians*

refers only to retrospective equitable damages akin to those awarded under Title VII). All of this is to say that because *Drayden* prohibited all monetary remedies, it has only been overruled to the extent that it barred retroactive back pay damages. To the extent that it bars other types of damage relief, it is still the law of this circuit. This Court has recently so held in *Rhodes v. Charter Hospital*, 730 F.Supp. 1383 (S.D.Miss.1989) (opinion of Judge Tom S. Lee).

As Judge Lee held in *Rhodes*, even if *Drayden* were not authoritative, other considerations would still compel the result that emotional distress damages are not recoverable under section 504. *Rhodes*, 730 F.Supp. at 1385. As the Court in *Bradford* stated, "Damages for mental suffering and humiliation are difficult to measure at best, are often sizeable, and have been editorialized as gratuitous bonuses or prize money for prosecuting a successful suit. Reinstatement, back pay, and attorneys' fees have been held to provide adequate remedial and deterrent effect in other discrimination cases within the employment context." Other courts have also held that damages for emotional distress, pain and suffering, or similar injuries are not recoverable under section 504. *See, e.g., Marshburn v. Postmaster Gen. of the United States*, 678 F.Supp. 1182 (D.Md.) (no damages for pain and suffering), *aff'd*, 861 F.2d 265 (4th Cir.1988); *Shuttleworth v. Broward County*, 649 F.Supp. 35 (S.D.Fla.1986) (no damages for pain and suffering); *Martin v. Cardinal Glennon Memorial Hosp. for Children*, 599 F.Supp. 284 (E.D.Mo.1984) (no damages for mental anxiety and humiliation).

Furthermore, although most of the cases denying emotional distress damages for section 504 violations arose in the context of employment discrimination, where the remedy of back pay is available, those cases are instructive in the present context. As the court in *Rhodes* stated:

> [E]ven though in many cases of discrimination against the handicapped there may be no possible claim for back pay, it

does not follow that those plaintiffs alleging other kinds of discrimination are entitled to other monetary relief. Indeed, it would hardly be consistent to allow recovery of damages for emotional distress by a plaintiff alleging discrimination outside of the employment context, but deny those same damages to a plaintiff alleging employment discrimination.

*Rhodes,* 730 F.Supp. at 1386.

■ Similarly, awards for such things as pain and suffering and emotional distress are not recoverable in this circuit in connection with the ADEA. *Guthrie v. J.C. Penney Co.,* 803 F.2d 202 (5th Cir.1986); *Smith v. Office of Personnel Management,* 778 F.2d 258 (5th Cir.1985). Likewise, the vast majority of cases in all circuits hold that the same is true of Title VII. *See, e.g., Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–64 (11th Cir.1982) and cases cited therein.

■ In *David H. v. Spring Branch Independent School District,* 569 F.Supp. 1324, 1331 (S.D.Tex.1983), the court indicated that damages in the form of reimbursement of private school tuition are similar to back pay awards and are recoverable by a student discriminated against by a public school even though other monetary damages were not recoverable. The district court in *Tallarico* held similarly when it awarded out-of-pocket expenses under the ACAA, but denied recovery of emotional distress damages. This Court believes that this is the better approach. Since emotional distress damages are not recoverable under section 504 of the Rehabilitation Act, they should not be recoverable under the ACAA, which merely extends the protection of the Rehabilitation Act to the context of private air carriers such as American.

■ Neither can punitive damages be recovered. The statutory scheme of the Rehabilitation Act is remedial and not punitive. *See Byers v. Rockford Mass Transit Dist.,* 635 F.Supp. 1387 (N.D.Ill.1986); *Gelman v. Department of Educ.,* 544 F.Supp. 651, 654 (D.Colo.1982).

■ Turning to the instant case, the complaint only alleges damages of the type that the Court rules are unavailable under the ACAA. Accordingly, the complaint will be dismissed in its entirety unless it states a claim for appropriate equitable relief. The Court is of the opinion that it does not.

The specific relief sought is an order requiring Defendants to implement rules, regulations and training procedures requiring officers, managers, agents and employees of American Airlines to properly comply with the ACAA as it relates to handicapped and disabled persons, and an order requiring Defendants to provide access to wheelchairs equipped with seat belts and other safety devices. The Court declines to grant such relief because of the doctrine of primary jurisdiction.[1]

■ The doctrine of primary jurisdiction operates to reconcile the functions of administrative agencies with the judicial function of the courts. *Mississippi Power & Light Company v. United Gas Pipe Line Co.,* 532 F.2d 412, 417 (5th Cir.1976). The doctrine applies where the enforcement of a claim requires resolution of issues under a regulatory scheme and where Congress has placed the responsibility for developing that regulatory scheme within the special competence of an administrative body. *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956). The doctrine is supported by the dual policies of obtaining uniformity in the regulation of a business and of obtaining access to specialized knowledge of agencies. *Id.* In the words of the Supreme Court:

Uniformity and consistency in the regulation of business entrusted to a particular

---

1. The Court, without so deciding, questions whether the Plaintiff has standing to assert injunctive relief in the first place. Nowhere does Plaintiff allege that in the absence of an injunction, he would likely be placed in the same situation again. As the Supreme Court stated in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), "Past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."

agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). After having reviewed the Proposed Rules Promulgated by the Secretary of Transportation, and observing that those proposed rules cover the matters which are the subject of Plaintiff's complaint, the Court is of the opinion that its duty is to refrain from entertaining the Plaintiff's claims for equitable relief since the Secretary of Transportation is statutorily charged with that obligation. *See Sunflower Electric Cooperative v. Kansas Power and Light Company*, 603 F.2d 791, 795 (10th Cir.1979) (where law vests in administrative agency power to decide controversy or treat issue, courts will refrain from entertaining case until agency has fulfilled its statutory obligation). The Court is of the opinion that it would be improper for the Court to attempt to draft and adopt regulations requiring American Airlines to provide specific services and facilities, including wheelchairs equipped with seat belts, when the Secretary of Transportation is in the process of doing that very thing, particularly where the Proposed Rules drafted by the Secretary indicate several diverse and competing interests in the subject matter. *See Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165 (D.C.Cir.1976) (denying injunction against Delta which would require it to provide certain warnings to passengers regarding presence of radioactive materials on flight because relief sought was more properly handled through a legislative-type procedure), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977).

The Court will dismiss Defendant AMR Services on its own Motion. The complaint names AMR Services as the parent of American Airlines. No separate allegation supporting a claim against AMR services is made. The Defendant AMR Services Corporation makes the assertion in its brief that it is *not* the parent of American Airlines, but is a sister corporation. It alleges that AMR Corporation (not a defendant in this action) is the parent of both American and AMR Services Corporation. The parties have adduced no evidence on this issue. It is clear, however, that the complaint states no cause of action against the parent of American Airlines, whichever entity that may be, and that AMR Services should be dismissed.

For the foregoing reasons, the Court is of the opinion that the Motion of the Defendants should be granted and the complaint dismissed.

IT IS SO ORDERED.