UNITED STATES of America, Plaintiff,

and

Louise Cooksey, Intervenor,

v.

FOREST DALE, INC., et al., Defendants,

v.

Henry G. CISNEROS, Secretary of the United States Department of Housing and Urban Development, Third–Party Defendant.

Civ. A. No. 3–92–CV–1029–H.

United States District Court,
N.D. Texas,
Dallas Division.

March 5, 1993.

Katherine Savers McGovern, U.S. Atty's Office, Dept. of Justice, Dallas, TX, Thomas J. Keary, Paul F. Hancock, John R. Dunne, Brian F. Heffernan, Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

Gayle Edward Oler, Law Office of Gayle E. Oler, Dallas, TX, for defendants.

Katherine Savers McGovern, Dept. of Justice, Dallas, TX, Thomas J. Keary, Paul F. Hancock, Brian F. Heffernan, Washington, DC, William V. Cerbone, Jr., U.S. Dept. of Housing and Urban Development, Fort Worth, TX, for Jack Kemp.

Analeslie Unfried Muncy, Susan Hutchison Holloway, David Fielding, Fielding Barrett & Taylor, Fort Worth, TX, for Louise Cooksey.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

Before the Court are five motions and sets of supporting briefs: (1) Defendant's First Motion for Partial Summary Judgment, filed November 25, 1992; Plaintiff United States' Memorandum in Opposition, filed December 15, 1992; Intervenor's Response, filed December 22, 1992; Defendant's Reply to Plaintiff's Memorandum in Opposition, filed December 30, 1992; Defendant's Reply to Intervenor's Response, filed January 7, 1993 and the Surreply of Plaintiff, filed January 29, 1993; (2) Defendant's Second Motion for Summary Judgment, filed January 15, 1993; Plaintiff's Memorandum in Opposition, filed January 29, 1993; Intervenor's Response, filed January 29, 1993; Defendant's Reply, filed February 12, 1993; and the United State's Supplemental Memorandum in Opposition to Defendant's First and Second Motions for Summary Judgment, filed February 12, 1993; (3) Defendant's Motion to Dismiss Intervenor's Complaint, filed December 22, 1992; and Intervenor's Response, filed January 19, 1993; (4) Intervenor's Motion for Partial Summary Judgment, filed January 15, 1993; Defendant's Response, filed January 29, 1993; and Intervenor's Reply, filed February 16, 1993; and (5) Third–Party Defendant HUD's Motion to Dismiss, or, in the Alternative, for Summary Judgment, filed January 15, 1993; Defendant's Response, filed January 29, 1993; and HUD's Reply, filed February 12, 1993.

### I. Background

In this suit, Intervenor Louise Cooksey alleges that she was discriminated against in her attempt to rent an apartment in the Forest Dale Apartments.[1] Cooksey states that on April 6, 1990 and July 3, 1990 she and her husband Leroy Cooksey, who was blind and partially paralyzed from a stroke, were denied an apartment in the Forest Dale Apartments, a "Section 202" housing project (the term which describes projects constructed with funds provided under Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q). Louise Cooksey alleges that she was discriminatorily denied an apartment because of Leroy Cooksey's physical disability. In response, Defendants deny that the rejection of the Cookseys was discriminatory, contending that Forest Dale Inc.'s agreement with the United States Department of Housing and Urban Development ("HUD") and HUD regulations require that the Forest Dale Apartments accept elderly, but not disabled, applicants.

On August 28, 1990, after she was denied an apartment, Cooksey filed a complaint with HUD pursuant to Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, ("Fair Housing Act"), 42 U.S.C. § 3601 *et seq.* HUD determined that there was reasonable cause to believe that a violation of the Fair Housing Act occurred and, on April 2, 1992, issued a charge of discrimination under 42 U.S.C. § 3610. While the resulting administrative proceeding arising out of Cooksey's complaint was still pending, Defendants elected to have the charges against them resolved in a federal civil action. *See* 42 U.S.C. § 3612(a). Thus, on May 20, 1992, the United States filed the present suit on behalf of Louise Cooksey. *See* 42 U.S.C. § 3612(*o*)(1). Defendants then answered and filed a counterclaim against Plaintiff, seeking declaratory relief and attorney's fees, and a third-party action against HUD, also for declaratory relief and attorney's fees. Louise Cooksey later sought leave to intervene in the government's suit, alleging two claims of relief: a claim brought under the Fair Housing Act and a claim brought under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Cooksey's motion to intervene was granted December 2, 1992 and her complaint was filed the same day. After reviewing the standards for examining summary judgment motions, the Court turns to the numerous motions which have been filed by all of the parties.

### II. Summary Judgment

"Summary judgment reinforces the purpose of the Rules, to achieve the just, speedy,

---

1. Forest Dale is an apartment complex owned by Defendant Forest Dale, Inc. and managed by Defendants Marvin O. Eads and Jo Ann Eads.

Defendant Homer O. Gainer is alleged to be the President of the Board of Directors of Forest Dale, Inc.

and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir.1986).

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment or partial judgment as a matter of law. *See* Fed.R.Civ.P. 56. Before a court may grant summary judgment, the moving party must demonstrate that it is entitled to judgment as a matter of law because there is no actual dispute as to an essential element of the nonmovant's case. *See Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The threshold inquiry, therefore, is "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "the substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. at 2510.

The Supreme Court has explained that a movant for summary judgment need not support the motion with evidence negating the opponent's case; rather, once the movant establishes that there is an absence of evidence to support the non-movant's case, the burden is on the non-movant to make a showing sufficient to establish an issue of fact for each element as to which that party will have the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

Once the moving party shows that it is entitled to summary judgment, the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (emphasis in original) (quoting Rule 56(e)); *see also Fontenot*, 780 F.2d at 1195–98. A party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at

586, 106 S.Ct. at 1356. Stated another way, "[i]f the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir.1991) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1357). However, all of the evidence must be viewed in the light most favorable to the motion's opponent. *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 292 (5th Cir.1990).

### III.  Analysis

*Defendants' First Motion for Partial Summary Judgment*

In their first motion for summary judgment, Defendants move for partial summary judgment against Plaintiff United States and against Third–Party Defendant HUD on all matters in issue except attorney's fees. In support of their motion, Defendants forward the following facts:

1) The Forest Dale Apartments, located at 11551 High Dale Drive, Dallas, Texas is a 206 unit multi-family "Section 202" senior-citizens apartment project occupied by elderly persons 62 years of age or older.

2) The Forest Dale Apartments are owned by Forest Dale, Inc., a Texas non-profit corporation which was created to build and operate the Forest Dale Apartments under a loan from HUD under Section 202 of the Housing Act of 1959 ("Housing Act"), 12 U.S.C. § 1701q.

3) The construction of the Forest Dale Apartments was financed with a loan from HUD pursuant to a loan agreement with Forest Dale, Inc. under Section 202 of the Housing Act. The original loan agreement was executed on December 1, 1966, was amended on July 1, 1967, and was amended again on February 1, 1971. The loan agreement was secured by a first-lien deed of trust and a second-lien deed of trust.

4) Prior to the disbursement of the loan funds, Forest Dale, Inc. and HUD entered into a Regulatory Agreement which governs the operation and occupancy of the apartments which were to be built with the loan.

5) The first and second lien deeds of trust securing the loan, to which the loan agreement, the amendments, and the Regulatory Agreement are attached, were contemporaneously filed with the Dallas County Clerk.

6) The loan agreement notes that the loan is made for the purpose of providing housing for elderly persons and elderly families.[2]

7) The Regulatory Agreement contains the express agreement of Forest Dale, Inc. to limit public occupancy of the Forest Dale Apartments to elderly persons and elderly families as defined in the Housing Act and to make the apartments available to eligible occupants at charges approved by HUD. Specifically, the Regulatory Agreement provided that Forest Dale would "limit public occupancy of the Project to elderly persons and elderly families as defined in the Housing Act of 1959 and any amendments thereto."[3]

8) On May 14, 1981, Forest Dale submitted a copy of its proposed Occupancy Agreement to HUD for its review and comment. The Occupancy Agreement stated that "[b]oth the owner and the tenant understand that ... [t]he physical facilities of Forest Dale and the services provided are designed for elderly persons who are physically independent and Forest Dale is not equipped to provide nursing home care or hospital care." The Occupancy Agreement also stated that:

> [t]he Owner may terminate this agreement ... [w]here, in the good faith judgment of the Owner, a prolonged illness of the Tenant shall require special care or treatment and such care or treatment shall tend to disrupt the general atmosphere and operation of Forest Dale or renders the Tenant to be "non-ambulatory" within the meaning of the HUD requirements that Forest Dale Tenants be ambulatory.

9) On May 27, 1981, HUD responded to Forest Dale's letter. This response did not indicate that HUD found the above quoted paragraphs to be objectionable.[4]

10) On June 7, 1983, Philip Abrams, the then-Assistant Secretary for Housing of HUD issued a Memorandum ("Abrams Memorandum"), the subject of which was to clarify HUD's "policy on admission of elderly and non-elderly handicapped persons to Section 202 projects." This interpretation of Section 202 stated:

> Eligible populations to be served under the Section 202 program are qualified individuals or families whose head of household or spouse is elderly, physically handicapped, developmentally disabled or chronically mentally ill. The fact that a person is eligible under the program, however, does not mean that the person is eligible for occupancy in each and every Section 202 project.

> .    .    .    .    .

> Individuals from one handicapped group may not be accepted for occupancy in a project designed for a different tenant group. For example, borrowers providing group homes for the developmentally disabled cannot admit the chronically mentally ill because of the special needs presented by each of these populations.... However, a sponsor can propose to house eligible tenant groups other than the one it was selected to serve, but must apply to the HUD field office for permission to do so, based on a plan which demonstrates that it can adequately serve the proposed tenant group.

11) On March 30, 1984, Maurice Barksdale, the then-Assistant Secretary of Housing for HUD issued a Memorandum ("Barksdale Memorandum"), the subject of which

---

**2.** The United States does not contest the fact that Forest Dale, Inc. entered into an agreement with HUD to provide rental housing for elderly families and elderly persons. However, the government denies that the agreement permits Defendants to exclude elderly persons and families who are *also* handicapped as the term handicap is defined in Section 202 of the Housing Act.

**3.** Again, the government denies that the Regulatory Agreement permits Defendants to exclude

elderly persons and families who are *also* handicapped.

**4.** However, the government denies that it in any way permitted Defendants to exclude persons who are not "physically independent" or persons who are "non-ambulatory" from residing at the Forest Dale Apartments, particularly in 1990. *See infra.*

was to further clarify the Section 202 admission criteria. This interpretation of Section 202 stated:

-that the Section 202 program was designed to serve persons who are either elderly or handicapped;

-that there are three distinct types of handicapped persons for Section 202 purposes—the physically handicapped (e.g. mobility impaired), the developmentally disabled, and the chronically mentally ill;

-that each group has distinct needs;

-that Section 202 developments should be custom-tailored to the specific client population sought to be served;

-that it would be inappropriate to house members of one Section 202 eligible group in a project tailored to another tenant population;

-that a Section 202 borrower must affirmatively demonstrate that it possesses the resources to meet the special needs of the tenant group sought to be served;

-that this custom-tailored approach to Section 202 housing must not be circumvented after the initial rent-up; and

-that HUD's local offices have a continuing obligation to verify that a project originally designed for one tenant group does not subsequently become populated with other tenant types when apartments are re-rented—unless the 202 borrower proposes, and HUD approves, a plan to serve eligible tenant groups other than the one originally selected to be served.

The government acknowledges that the memoranda discussed in paragraphs 10 and 11 were issued by HUD officials; however, the government states that these statements do not justify the exclusion of elderly persons who are also handicapped and that the HUD policy was later clarified to reflect this point.

12) The government explains that on July 11, 1988, after Defendants submitted the Occupancy Agreement for HUD approval but before the alleged discrimination, HUD's Final Rule titled Nondiscrimination Based on Handicap In Federally Assisted Programs and Activities became effective. *See* Final Rule, Nondiscrimination Based on Handicap In Federally Assisted Programs, 53 Fed.Reg.

20,216 (1988). The government asserts that, as participants in the Section 202 program, Defendants were obliged to rent apartments at the Forest Dale Apartments in accord with these regulations.

The government states that these regulations do not sanction the exclusion of handicapped persons who are otherwise qualified for participation in programs which receive federal assistance. For example, in the discussion of the definition "qualified individual with a handicap" for federally subsidized housing, HUD's Final Rule stated: "After carefully considering the comments received regarding the phrase 'capable of independent living' . . . the Department has determined to delete the phrase from the definition." "Instead the definition as revised focuses upon an occupant being capable of complying with all the obligations of occupancy . . . with supportive services provided by persons other than the recipient." *Id.* at 20218. The final HUD rule also stated that "HUD recipients will have to make decisions as to whether each applicant is qualified on a case by case basis in the course of their ordinary eligibility determinations." "In making these determinations, a presumption in favor of the individual's own assessment of his or her capabilities is warranted in the absence of substantial evidence to the contrary." Furthermore, the Final Rule stated that "[i]n a project that does not provide support services, it is not legally significant whether the obligations of tenancy are met by the individual alone or with assistance which he or she arranges." *Id.* at 20219.

Moreover, the government argues that HUD's Final Rule indicates that Defendants' interpretation of its obligations under Section 202 is erroneous and that HUD did not interpret the Housing Act to condone the categorical exclusion of persons who are both elderly and handicapped from Section 202 projects which were created to serve the elderly. In the Final Rule, HUD stated that:

section 202 housing developments are custom tailored to the specific client population or populations the sponsor was approved by HUD to serve. For instance, many section 202 projects are lawfully limited to elderly persons and the physically

handicapped. It follows that developmentally disabled and chronically mentally ill persons who are not elderly or physically handicapped, are not otherwise qualified individuals with handicaps.

53 Fed.Reg. 20220 (1988).

The government also argues that Defendants were further obliged to alter the terms of the Occupancy Agreement by the enactment of the 1988 amendments to the Fair Housing Act, effective March 12, 1989, which provide that in the event a person is determined to be handicapped, such person must be provided an opportunity to make reasonable modifications of the premises at his or her own expense. *See* 42 U.S.C. § 3604(f)(3)(A). That provision of the Fair Housing Act provides that handicap discrimination prohibited by the Act includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person...." *Id.*

Finally the government has presented portions of the most recent edition of HUD's handbook *Occupancy Requirements of Subsidized Multifamily Housing Programs* ("Handbook"), issued January 19, 1993. This Handbook, which is provided to owners and managers of federally subsidized housing projects, describes admissions criteria for federally subsidized housing, including the Forest Dale Apartments. The Handbook recognizes that Section 202 housing which serves one Section 202 class (such as the elderly) may exclude applicants who do not fall within that class. Hence, the Handbook states that "[u]nits designed for a particular category of persons 62 years of age or older may be restricted to families whose head or spouse is at least 62 years of age." Handbook, 2–1, at 2–1—2–2. However, the Handbook also notes that applicant may not be excluded from a Section 202 project simply because they also fall into another Section 202 category. Thus, the Handbook notes that "[a]pplicants who meet the eligibility requirement for admission and who also have other physical or mental handicaps or disabilities, cannot be excluded on the basis that they have a handicap besides the one served by the project." Handbook, 2–9(e), at 2–14.

13) In 1989, Leroy and Louise Cooksey submitted a written application for joint occupancy of an apartment at the Forest Dale Apartments.

14) On April 6, 1990, Louise Cooksey went to the Forest Dale Apartments for an interview. First, Louise visited the Forest Dale Apartments without Leroy. Later, Leroy and Louise returned together.

15) Leroy and Louise Cooksey were a "handicapped family" as defined in Section 202 of the Housing Act.

16) In the April 6, 1990 interview, Marvin Eads, Jo Ann Eads, and Louise Cooksey discussed Leroy and Louise Cooksey's eligibility to rent an apartment at the Forest Dale Apartments.

17) On June 25, 1990, Leroy Cooksey died.

18) On July 3, 1990, Marvin Eads wrote to Mr. and Mrs. Cooksey and stated that Mr. Cooksey was not an eligible applicant. In this letter, Eads explained Forest Dale's policy towards physically impaired persons:

In the [April 6, 1990] interview, it was explained that from the very beginning of Forest Dale Apartments in 1967 rental units have been made available to only ambulatory senior citizens.

19) On July 30, 1990, Louise Cooksey filed a Housing Discrimination Complaint against the Forest Dale Apartments, Marvin Eads, and Jo Ann Eads with the Fair Housing Administrator of the City of Dallas. The Eads and the Forest Dale Apartments were notified of this filing on August 6, 1990.

20) On August 28, 1990, Louise Cooksey filed an identical complaint with HUD. HUD notified Marvin and Jo Ann Eads and the Forest Dale Apartments of this filing on September 13, 1990.

21) On December 26, 1990, the Fair Housing Administrator of the City of Dallas informed Defendants' counsel that the City planned to charge Marvin Eads with illegal housing discrimination under ordinances of the City of Dallas.

22) On April 9, 1991, Louise Cooksey filed another housing discrimination complaint with HUD against Marvin Eads, Jo Ann

Eads, and the Forest Dale Apartments. Mr. Eads received a copy of this charge on April 18, 1991.

23) On December 5, 1991, Louise Cooksey filed yet another Housing Discrimination Complaint with HUD. This filing is identical to the complaint Cooksey filed with HUD on August 28, 1990, except that the word "Amended" appears in one corner of the complaint and Forest Dale, Inc. (as owner) and Homer Gainer (as president of the board of Forest Dale, Inc.) were added as parties.

The government argues that the December 5, 1991 complaint which Louise Cooksey filed with HUD was not a new complaint, explaining that it was an amendment to the August 28, 1990 complaint which was designed to add Homer O. Gainer and Forest Dale, Inc. as respondents. The government adds that the Eads, the Forest Dale Apartments, Forest Dale, Inc., and Homer Gainer were informed of the fact that they were considered to be respondents on the same day that the amended complaint was filed.

24) On May 29, 1991, a Fair Housing Inspector from the City of Dallas Fair Housing Office filed a judicial complaint against Marvin Eads in the Municipal Court of the City of Dallas, alleging that on July 3, 1990 Mr. Eads engaged in a discriminatory housing practice by making a written statement, indicating a policy to discriminate on the basis of disability in the renting of apartments.

In response to this paragraph (as well as to paragraphs 21 and 25) the government notes that neither it nor Louise Cooksey were parties to the state prosecution. Further, the government states that the jury was instructed to weigh the elements of the crime charge against the "beyond a reasonable doubt" standard. The government also states that the issues before the jury were not the same as those before this Court. While the government acknowledges that the question of whether Marvin Eads engaged in handicap discrimination was a question before the state jury (and will likewise be a question before this Court), the government argues that the state trial is not directly applicable to the present case because the relevant chapter of the City of Dallas Code in effect at the time of the April 6, 1990 incident did not include "handicap" within the list of interests protected. Thus, the government argues that in acquitting Eads, it was not necessary for the jury to reach the question of discrimination because they could simply have decided that the Dallas ordinance was inapplicable.

25) Defendants report that in the March 18, 1992 trial held in the Dallas Municipal Court Eads was found not guilty of the offense charged in the complaint. Defendants also state that Louise Cooksey testified that she and her husband were not turned down for an apartment on April 6, 1990, but that she was told that their application would be taken under consideration and that Defendants would inform her of Forest Dale's decision a later point in time.

In response to this paragraph (as well as to paragraphs 16–18), the government states that, while it does not dispute the fact that Louise Cooksey interviewed at the Forest Dale Apartments on April 6, 1990 or that Leroy Cooksey died on June 25, 1990, it does dispute Defendants' characterization of these events—that the only act of discrimination which occurred was the July 3, 1990 rejection letter, which occurred after Leroy Cooksey's death.

In support of its interpretation of events, the government notes that before the April 6, 1990 interview, Defendant Jo Ann Eads contacted Mrs. Cooksey to discuss the Cookseys' application for an apartment at Forest Dale. The government states that after waiting for an apartment at Forest Dale for almost a year, Jo Ann Eads told Louise Cooksey that an apartment would be ready for them on May 1, 1990. The government also claims that during the April 6, 1990 interview Defendants indicated that the Cookseys would not be accepted for the May 1st opening. Instead, the government reports that Marvin Eads stated that he would give the Cookseys' application to the Forest Dale board of directors, that the Cookseys would be placed at the bottom of the waiting list, and that if the board acted favorably, the Cookseys' place on the waiting list would rise. Thus, the government contends that the Cookseys were denied an opportunity to rent an apartment

at the Forest Dale Apartments and that this discrimination continued through the July 3, 1990 letter.

26) Defendants state that on or before April 2, 1992, the Secretary of HUD had certified a State of Texas public agency and a City of Dallas local public agency as substantially equivalent pursuant to 42 U.S.C. § 3610(f).

The government notes that the State of Texas was certified as substantially equivalent on October 30, 1990, more than two months after Mrs. Cooksey filed her HUD complaint, and that the City of Dallas was so certified on June 12, 1992, more than two years after Mrs. Cooksey filed her HUD complaint.

27) On April 2, 1992, the Secretary of HUD issued a charge against Forest Dale, Inc., Forest Dale Apartments, Marvin O. Eads, Jo Ann Eads, and Homer Gainer with the Office of Administrative Law Judges. Defendants state that no claim was made in the charge that Respondents acted intentionally, willfully, or in disregard of the rights of Louise Cooksey.

28) On April 20, 1992, Defendants filed their notice of their election to have the claims asserted in the Charge decided in a civil action.

29) On May 20, 1992, Plaintiff filed this action on behalf of Louise Cooksey.

Defendants move for summary judgment against Plaintiff on seven grounds:

■ First, Defendants argue that Leroy and Louise Cooksey did not qualify for occupancy at the Forest Dale Apartments and that Forest Dale's occupancy criteria are lawful. Under the first prong of Forest Dale's two-pronged test for occupancy eligibility, an applicant must be 62 years of age or older. Under the second prong, an applicant must *not* be a member of a category or group of persons defined in Section 202 of the Housing Act other than "elderly". Defendants argue that their selection criteria accurately reflect the selection criteria which the Forest Dale Apartments agreed to implement in the loan agreement and Regulatory Agreement and which were contemplated by Congress when it enacted the Housing Act.

In enacting Section 202 of the Housing Act, Congress authorized the extension of long term, low interest loans to entities which would dedicate their housing to elderly or handicapped persons or families or certain segments of this population. *See* 12 U.S.C. § 1701q(a). Section 202 housing is designed to serve four populations: elderly persons or elderly families (defined to be persons or families headed by persons 62 years of age or older) and three categories of disabled persons (the developmentally disabled, the mobility impaired, and the chronically mentally ill). When HUD extended Forest Dale, Inc. a Section 202 loan in 1967, Forest Dale agreed to rent their apartments to elderly persons and families as defined by the Housing Act.

After Forest Dale entered the Section 202 program, Congress enacted the Rehabilitation Act of 1973, 29 U.S.C. § 794, to prohibit federally subsidized housing providers from engaging in discrimination against the disabled. Later, Congress enacted the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.,* to extend the prohibition against handicap discrimination to virtually all housing providers and to strengthen the prohibition against handicap discrimination found in the Rehabilitation Act.

Defendants argue that, while the Cookseys were both over 62 when they applied, the Cookseys failed to satisfy the second prong of the project's eligibility criteria because Leroy Cooksey was "handicapped" and the Cookseys together were a "handicapped family" within the meaning of the Housing Act. *See* 12 U.S.C. § 1701q(d)(4). Therefore, Defendants contend that Leroy and Louise Cooksey were in a class or group of persons defined in Section 202 that the Forest Dale Apartments were not designed, intended, or approved to serve. Thus, Defendants conclude that the Cookseys were ineligible to occupy an apartment in the project. In other words, Defendants state that their determination of eligibility under Section 202 did not constitute discrimination on the basis of disability under the Fair Housing Act; instead, Defendants claim that its determina-

tion was both lawful and required by Section 202. It is the legality of Defendants' selection criteria which forms the crux of the present case.

Plaintiff contends that Forest Dale was not authorized to serve only elderly non-disabled persons and that Defendants are not immunized from the requirements of the Fair Housing Act. Simply put, Plaintiff's allegations are based on the charge that Defendants discriminatorily distinguished among applicants who were 62 years of age or older by excluding the Cookseys because they were a "handicapped family." Plaintiff argues that Defendants violated the Fair Housing Act by excluding the Cookseys because of Leroy Cooksey's disability. In other words, Plaintiff contends that Forest Dale had no authority to categorically exclude members of their selected client population, such as the Cookseys, who were *also* members of another Section 202 category, simply *because* they were also members of another Section 202 category.

In support of their argument, Defendants cite three circuit court cases, none of which support their position. In *Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343 (10th Cir.1987), the Tenth Circuit considered a case in which non-elderly and non-mobility impaired persons who were mentally impaired and developmentally disabled complained that they were illegally denied admission to a Section 202 project. The Section 202 project in question, however, was open to the two classes of persons into which the plaintiffs did not fall: the elderly and mobility impaired. The plaintiffs complained that their exclusion violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Equal Protection Clause of the Fourteenth Amendment. The *Knutzen* court held that the plaintiffs were not discriminated against, concluding that the exclusion of those who were neither elderly nor mobility impaired was authorized by Section 202 and that this exclusion did not violate the Rehabilitation Act or the Equal Protection Clause.

*Knutzen* stands for the proposition that Section 202 sponsors may choose to benefit one or more of the four groups defined in Section 202 *without* benefitting the other Section 202 groups and that Section 202 sponsors may exclude applicants who may be members of *a* Section 202 category but who are not members of the particular category or categories which the particular Section 202 project was created to serve. *Knutzen* thus has no direct bearing on the case at hand. This is because the plaintiffs in *Knutzen* were neither elderly nor mobility impaired and because the Section 202 project to which the plaintiffs sought access was limited to those two groups. The *Knutzen* court did not confront the situation which the Court confronts here—a situation in which the plaintiff *does* fall into the Section 202 group which the project was created to serve.[5] Thus, *Knutzen* cannot stand for the proposition for which Defendants cite it—that a Section 202 project may reject the application of a prospective tenant who is a member of the group the project serves simply because the prospective tenant is *also* a member of a group which the project does not also serve.

The only other directly relevant case which Defendants cite is *Brecker v. Queens B'Nai B'rith Housing Development Fund Co.,* 798 F.2d 52 (2d Cir.1986). Defendants cite this case for the same proposition for which they cited *Knutzen.* However, *Brecker* involved the same fact pattern as *Knutzen*—plaintiffs who claimed to fall into *a* Section 202 class were denied admission to Section 202 projects which served *other* Section 202 classes. The plaintiffs in *Brecker* did not fall into either of the categories which the defendant housing project was set up to serve. Again, the present case presents a different situation—the Cookseys claim to fall into the precise Section 202 category for which the Forest Dale Apartments were built to serve—the elderly and elderly families. Thus, neither of the relevant cases cited by Defendants hold that Defendants cannot be held liable under the Fair Housing Act.[6]

---

**5.** *See Knutzen,* 815 F.2d at 1353 n. 9 ("[T]his case would be significantly different if the [plaintiffs] satisfied one of [the Section 202 housing project's] admission criteria.").

**6.** Defendants also argue that they cannot be held liable under the Fair Housing Act because Section 12 of the Fair Housing Amendments Act of 1988 indicates that Congress did not intend to

In further support of their argument, Defendants also contend that HUD's interpretations of Section 202, such as the Abrams and Barksdale memoranda, allow Defendants to exclude elderly applicants who are also disabled. However, after examining more recent HUD interpretations of the law, the Court cannot say that Defendants' argument entitle them to judgment as a matter of law.

■ Second, Defendants assert that Plaintiff's suit, filed May 20, 1992 is barred by a state two-year statute of limitations. However, in the end, this argument is not persuasive.

Defendants note that it is well settled that if Congress creates a cause of action, but does not specify the time within which it must be asserted, a state statute of limitations may be absorbed or applied. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987). Defendants argue that the Fair Housing Act provides no specific statute of limitations and that a two-year Texas statute should be applied. However, in this case, Congress has specified applicable time limitations. The Fair Housing Act states that § 3610 complaints must be filed by an aggrieved person within one year after the alleged discriminatory housing practice has occurred or terminated. 42 U.S.C. § 3610(a)(1)(A)(i). In this case, the Court assumes that the alleged discrimination occurred from April 6, 1990 through July 3, 1990. Louise Cooksey filed her first complaint with HUD on August 28, 1990. She thus filed her complaint well within the relevant one year period.

■ One other time limitation is applicable here. Once HUD determined that reasonable cause existed to charge Defendants with discrimination and issued its charge, and once Defendants elected to litigate the discrimination claim in this court, the Attorney General was required to file suit within 30 days. 42 U.S.C. § 3612(*o*). Here, Defendants elected a judicial resolution of the

charges against them on April 29, 1992. The Complaint was then timely filed on May 20, 1992.

■ Moreover, while Plaintiff acknowledges that Louise Cooksey's complaint was amended on December 5, 1991 to add Defendants Forest Dale, Inc. and Homer O. Gainer as respondents, Plaintiff correctly notes that the addition of these parties is not barred by the one-year statute of limitations for the filing of a Fair Housing Act complaint. The one-year limitation period is not applicable to the amendment of an administrative complaint which adds parties. A statutory relation back provision, 42 U.S.C. § 3610(a)(1)(D), provides that "[c]omplaints ... may be reasonably amended at any time." *See also* 42 U.S.C. § 3610(a)(2)(A) (allowing aggrieved persons to amend complaints to add respondents identified in the course of the investigation). Moreover, HUD rules provide that complaints can be amended to add respondents and that amended complaints "will be considered as having been made as to the original filing date." 24 C.F.R. § 103.42 (1992).

■ Third, Defendant moves for summary judgment on the July 3, 1990 alleged act of discrimination, noting that Leroy Cooksey died on June 25, 1990. Defendants argue that, after his death, Leroy Cooksey was not a person with a handicap within the meaning of the Fair Housing Act. However, this argument cannot succeed. First, the Court has already indicated that Louise Cooksey has standing as an aggrieved person because she was associated with her husband Leroy. Second, there is at best an issue of fact about the interpretation of the alleged April 6, 1990 and July 3, 1990 acts of discrimination.

■ Fourth, Defendants argue that this suit should be dismissed because HUD unduly delayed the completion of its investigation of Louise Cooksey's discrimination complaint. The following facts do not seem to be in dispute: Louise Cooksey filed her first dis-

preempt any other federal act, such as Section 202. Defendants thus argue that Forest Dale's agreement with HUD to limit occupancy of the Forest Dale Apartments to "elderly families" as defined in Section 202 was not preempted or limited and that the ineligibility of "handicapped

families" as defined in Section 202 was also not preempted. However, this argument assumes that the Housing Act authorizes Defendants to exclude handicapped persons. As noted above, this assumption is not true. Thus, Defendants' argument cannot succeed.

crimination complaint on August 28, 1990. She signed another complaint with HUD on April 9, 1991 (however, this complaint indicates the filing date to be August 28, 1990). The government also states that Cooksey amended her August 28, 1990 complaint on December 5, 1991. On December 13, 1991, HUD notified Forest Dale, Inc. and Marvin Eads that the investigation of Louise Cooksey's complaint was not complete. On December 16, 1991, HUD sent a similar letter to Homer Gainer. Finally, on April 2, 1992, HUD issued its charge of discrimination.

The Fair Housing Act directs HUD to complete its investigation "within 100 days after the filing of the complaint ... unless it is impracticable to do so." 42 U.S.C. § 3610(a)(1)(B)(iv). If HUD is unable to complete its investigation within this time, "the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so." 42 U.S.C. § 3610(a)(1)(C). This statutory framework explicitly allows HUD to extend its investigation of complaints beyond 100 days provided that HUD notifies the parties and states the reasons for the delay. Thus, the Sixth Circuit has stated that delay "beyond 100 days does not constitute a violation of § 3610 nor the regulations thereunder because subsection (C) permits the secretary to set out the reasons for the delay." *Baumgardner v. HUD*, 960 F.2d 572, 578 (6th Cir.1992). While the Sixth Circuit stated that "[t]here is an implied 'good cause' basis for extending the period for investigation beyond 100 days," *id.* at 578, it indicated that HUD's "procedural shortcomings" alone are not a sufficient basis for automatic dismissal of an action. Instead, the *Baumgardner* court examined the record to determine whether the Defendant was "substantially prejudiced" by HUD's inaction. *Id.* As noted above, Cooksey's first complaint was filed with HUD on August 28, 1990. On December 13 and 16, 1991, HUD notified the parties that the completion of its investigation would be delayed, stating that the agency needed more time to collect and

analyze information. HUD did not then issue a charge of discrimination until April 2, 1992.

Defendants argue that HUD's failure to issue its discrimination charge until April 2, 1992, 582 days after Louise Cooksey filed her first complaint, prejudiced them. However, at this juncture, the Court cannot conclude that Defendants have been substantially prejudiced. First, the Court examines the length of the delay itself. The Court notes that the Fair Housing Act allows a complainant one year to file his or her complaint. Thus, Cooksey could have filed her complaint as late as July of 1991. Moreover, the statutory scheme contemplates a 100 day investigation period and provides for extensions. Given this background, the Court cannot conclude that the length of the delay between Cooksey's first complaint and HUD's charge of discrimination alone was unreasonable or that it substantially prejudiced Defendants. Second, the Court notes that there is no indication that HUD's delay compromised Defendants' ability to defend Cooksey's charges. Indeed, throughout most of the period of delay, Defendants were defending a similar complaint about the same incident in another forum. This fact suggests that the delay has not compromised Defendants' ability to forward documentary evidence in its defense. Finally, there is no suggestion that witnesses are now unavailable. *Cf. EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 857–58 (8th Cir.1978) (affirming the dismissal of a Title VII suit after a delay of more than four years in which the aggrieved person's supervisors had left the company, making defense of the charge "difficult if not impossible").[7]

■ Fifth, Defendants charge that HUD failed to comply with the mandatory referral and prohibition-from-action provisions of 42 U.S.C. § 3610(f)(1). However, Defendants' argument is without merit. Section 3610(f)(1) provides that "[w]henever a complaint alleges a discriminatory housing practice [that is] within the jurisdiction of a State or local public agency [and] such agency has

---

7. Of course, this discussion assumes that Defendants' laches-type defense is available against the government in this situation. However, this assumption may not be correct. *See United States v. Popovich*, 820 F.2d 134 (5th Cir.), *cert. denied*,

484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). Nevertheless, the Court need not address this question since the Court has concluded that Defendants have not shown unreasonable delay or substantial prejudice.

been certified by the Secretary under this subsection; the Secretary shall refer such complaint to that certified agency before taking any action with respect to such complaint." However, this provision of the Fair Housing Act presupposes the fact that, when the complaint is made, a certified state or local fair housing authority exists to which the complaint can be referred. When Louise Cooksey made her complaint, neither the City of Dallas nor the State of Texas had an enforcement agency which had been certified by HUD. Thus, HUD was not required to refer Louise Cooksey's complaint to any other agency.

■ Sixth, Defendants assert that this suit is barred by waiver, the doctrines of claim and issue preclusion, and election of remedies. On March 18, 1992 Marvin Eads was tried and acquitted on the criminal charge of violating a City ordinance which makes housing discrimination on the basis of handicap unlawful. Defendants argue that because Marvin Eads was acquitted of a charge brought in the Dallas Municipal Court on the same transaction and allegations of fact which make up the basis of Plaintiff's suit brought on behalf of Louise Cooksey here, Louise Cooksey, or anyone acting in her behalf, is precluded from re-litigating the matters which were resolved against her in Municipal Court.

However, Defendants' contentions must fail. First, the defenses of claim and issue preclusion are not available to Defendants. The claim preclusion defense is not available to Defendants because neither the United States nor Cooksey could have been parties to the municipal court criminal action. Thus, neither the government nor Cooksey could have brought their claims in that action. It is axiomatic that claim preclusion does not apply in a second case if the claim could not have been brought in the first action. Issue preclusion is similarly unavailable. The principle underlying issue preclusion is that courts should generally honor the initial decision of an earlier court concerning an issue actually litigated which was necessary to the first court's judgment and which involves the same parties. Here, issue preclusion is not available for several reasons, the most simple

of which is that this is a civil case, but the Dallas Municipal Court case was a criminal action. It is well established that "the government's failure to establish an issue beyond a reasonable doubt in a criminal prosecution does not preclude a subsequent attempt to establish the same proposition by a lower degree of persuasion in a civil action." *One Lot Emerald Cut Stones & One Ring v. United States,* 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972). Given this conclusion, the Court need not address the government's contention that it was unnecessary to decide whether Marvin Eads discriminated against Cooksey because the jury could have determined that the alleged discrimination was not illegal at the time.

■ Moreover, the government correctly notes that the doctrine of election of remedies is not applicable here. That doctrine is aimed at the prevention of double recovery. However, where the state brings a criminal action seeking fines to deter future acts of discrimination, a subsequent civil action for recovery of damages is not double recovery.

■ Seventh, Defendants assert that Plaintiff's claim that Defendants' actions were intentional, willful, and taken in disregard for the rights of Louise Cooksey and Plaintiff's request for punitive damages are unauthorized because HUD made no such claims in its administrative charge. Defendants contend that their election under 42 U.S.C. § 3612(a) to have this dispute heard in this Court limits the claims that can be made in this action to the claims asserted in the administrative charge. Noting that no claim for punitive damages was made in the charge, Defendants assert that Plaintiff has waived its right to seek punitive damages in this case.

However, this claim in unpersuasive. Plaintiff explains that HUD did not allege intentional or willful conduct by the Defendants in their administrative complaint because the Fair Housing Act does not authorize a HUD Administrative Law Judge to award punitive damages in an administrative proceeding. *See* 42 U.S.C. § 3612(g)(3). Plaintiff also explains that when the Attorney General sues on behalf of an aggrieved party,

the United States may seek, and the Court may award, the same relief that the aggrieved party could obtain if he or she brought a private action. *See* 42 U.S.C. § 3612(*o*)(3). Since a private action brought under the Fair Housing Act specifically provides for punitive damages, *see* 42 U.S.C. § 3613(c)(1), Plaintiff is entitled to seek such relief in its suit.

Also in Defendants' First Motion for Summary Judgment, Defendants Forest Dale, Inc. and Homer O. Gainer seek summary judgment on the claims that Plaintiff has brought against them on the grounds that the Charge issued against them by HUD is barred by limitations, unauthorized by law, and unenforceable.

First, these Defendants argue Louise Cooksey's housing discrimination claim against Forest Dale, Inc. and Gainer based on events which occurred on April 6, 1990 and July 3, 1990 was not filed with HUD until December 5, 1991, well beyond the one-year limitation period for filing such complaints set out in 42 U.S.C. § 3610(a)(1)(A). However, for the reasons articulated above, Louise Cooksey was entitled to amend her complaint and add additional parties at any time.

Forest Dale, Inc. and Gainer also argue that HUD failed to give them notice as required by 42 U.S.C. § 3610(a)(1)(B) in the time and manner required by that statute. These Defendants charge that they were not notified within ten days after they had been identified as additional respondents and that the notice did not explain the basis for the Secretary's belief that they should be joined as additional respondents. However, the summary judgment evidence submitted by Defendants plainly reveals that HUD mailed sufficient notices to Gainer and Forest Dale, Inc. on December 5, 1991, the same day that Cooksey filed her amended complaint.

■ Finally, Gainer argues that since neither the administrative charge nor Plaintiff's complaint alleges that he was personally involved in the alleged discriminatory acts, the complaint against him should be dismissed. However, the Court cannot conclude that this argument is sufficient to warrant summary judgment in favor of Gainer at this time. In *Northside Realty Associates,*

*Inc. v. United States,* 605 F.2d 1348, 1354 (5th Cir.1979), the court held that it was proper to hold individual officers of a corporation responsible for the discriminatory acts of the agents of the corporation when the district court found that the officers either encouraged or could have prevented the agent's discriminatory conduct. *See also Walker v. Crigler,* 976 F.2d 900, 904–05 (4th Cir.1992). Thus, the Court holds that Gainer has not shown that Plaintiff cannot prove a set of facts which would entitle it to judgment against him.

Finally, in Defendants' First Motion for Summary Judgment, all Defendants move the Court to enter a declaratory judgment against Third–Party Defendant HUD which states that Defendants' conduct was lawful. However, for the reasons discussed above, such relief is not warranted.

Defendants' First Motion for Partial Summary Judgment is DENIED.

### *Defendants' Second Motion for Partial Summary Judgment*

In their second motion for summary judgment, Defendants move for partial summary judgment against Plaintiff United States, Intervenor Cooksey, and Third–Party Defendant HUD on all matters except attorney's fees. Defendants forward three arguments in support of their contentions, none of which are persuasive.

■ First, Defendants argue that the "handicap" provisions of the Fair Housing Amendments Act of 1988 do not apply retroactively to housing owned and in existence on the effective date of the 1988 Act. Defendants' argument would effectively make the Act applicable only to housing constructed after the effective date of the Act. This construction of the Act is plainly wrong. The Act makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). The prohibition against handicap discrimination is thus applicable to discriminatory conduct in the lease or rental of any dwelling which occurs after the effective date of the Act. Plaintiff and Intervenor

have alleged that Defendants discriminatorily denied the Cookseys an apartment on the basis of handicap after the effective date of the 1988 Act. Hence, there is no issue of the retroactive application of the Act.

Second, Defendants claim that they are entitled to judgment because neither Louise nor Leroy Cooksey had any property interest in the Forest Dale Apartments. Again, this argument has no merit. Whether the Cooksey's had a property interest in their right to reside at the Forest Dale Apartments is wholly beside the point.

Finally, Defendants contend that they must prevail as a matter of law because Leroy Cooksey was not an eligible applicant for occupancy in the Forest Dale Apartments because he did not meet the occupancy criteria approved by HUD for the Forest Dale Apartments. Defendants contend that the Regulatory Agreement with HUD required the Forest Dale Apartments to limit the occupancy of the project to elderly persons who are not also handicapped. However, this point simply rehashes the first motion for summary judgment and need not be discussed again. This argument, therefore, affords Defendants no basis for summary judgment in their favor.

Defendants also move the Court to enter a declaratory judgment against Third–Party Defendant HUD that the Forest Dale occupancy criteria are lawful. However, for the reasons discussed above, this relief is not warranted.

Defendants' Second Motion for Summary Judgment is DENIED.

### Defendants' Motion to Dismiss Intervenor's Complaint

Defendants also move to dismiss both of Intervenor's claims: Intervenor's claim brought under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* and Intervenor's claim brought under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[8]

█ First, Defendants argue that Intervenor's Fair Housing Act claim is barred by a two-year statute of limitations. However, this contention is unpersuasive. In this case, Intervenor followed the statutory requirements necessary to assert her claim. It is undisputed that, pursuant to 42 U.S.C. § 3610(a)(1)(A)(i), Intervenor filed her complaint with HUD within one year after the alleged discriminatory housing practice. Once the case was brought to federal court, she intervened as of right under 42 U.S.C. § 3612(o)(2). That provision of the Fair Housing Act allows aggrieved individuals to intervene in suits brought by the government on their behalf, stating "[a]ny aggrieved person with respect to the issues to be determined in a civil action under this subsection may intervene as of right in that civil action." The language of § 3612(o) (2) is broad; it does not indicate that the right to intervene in a suit brought by the government is in any way limited by the two-year period which § 3613(a)(1)(A) sets out as a limit on the time during which an aggrieved person may commence a civil action to enforce the Act.

Defendants' second and third arguments against Intervenor's Fair Housing claim are similarly unavailing. As noted in this Court's Order which allowed Intervenor to intervene in this suit, Louise Cooksey is an aggrieved individual who may bring suit under the Fair Housing Act. 42 U.S.C. 3602(i)(1) broadly defines an "aggrieved person" to include "any person who claims to have been injured by a discriminatory housing practice. . . ." Moreover, the Fair Housing Act protects "any person associated with that [handicapped] buyer or renter." *See* 42 U.S.C. § 3604(f)(1)(C). Cooksey acknowledges that she is not handicapped herself, but she alleges that she and her now deceased husband were injured when Defendants denied them the opportunity to rent a unit in the Forest Dale Apartments because of his handicap.

Defendants have also moved to dismiss Intervenor's second claim for relief, brought under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Although Intervenor's standing to assert this claim is ques-

---

8. Of course, since Defendants' motion referred to evidence outside of the pleadings, it will be considered a motion for summary judgment.

tionable and the relief to which Intervenor would be entitled is limited, the Court reserves its decision on whether Intervenor's § 504 claim will be dismissed.

In her complaint, Intervenor contends that she was discriminated against in violation of Section 504 of the Rehabilitation Act. Specifically, she states that by excluding her and her husband from the Forest Dale Apartments, Defendants violated Section 504. However, Section 504 of the Rehabilitation Act states that:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). The relevant portion of Section 706(8), in turn, defines "individual with handicaps" as any person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B).

Significantly, Louise Cooksey has not alleged that she meets any of the three definitions of a "individual with handicaps." Instead, Intervenor claims that she has standing to assert a Section 504 claim because she was "an intended beneficiary of the federal aid, and she was denied that aid because of discrimination against her handicapped spouse." Intervenor's Response to Defendants' Motion to Dismiss at 2. However, this assertion, even if true, does not necessarily allow her to pursue a Section 504 claim.

It is important to note that Intervenor has not brought this claim on behalf of her deceased husband; she has brought it on behalf of herself. However, Section 504 does not allow her to recover as though she were protected under that statute. In an analogous case, *Sanders by Sanders v. Marquette Public Schools*, 561 F.Supp. 1361, 1368–70 (W.D.Mich.1983), a public school system allegedly denied the Plaintiff's minor daughter, a learning disabled child, her rights under the Rehabilitation Act. The court held the

Plaintiff had standing to sue only on behalf of his daughter and that the Plaintiff had no standing to sue for his own personal injuries. Applying this reasoning to the present case, the Court notes that Intervenor has no standing to sue for her own purely personal injuries which arise from the alleged discrimination against her husband.

■ However, the Court notes that a theoretical possibility exists that Intervenor could recover some damages under Section 504. In *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103 (9th Cir.1987), the Ninth Circuit held that it could not accept the *Sanders* ruling to the extent that

> it precluded the father from recovering expenses he incurred to secure for his daughter an education that the school district was legally obligated to provide.

*Id.* at 1115. The *Zolin* court allowed the Plaintiff, an organization created for the benefit of hearing-impaired persons, to maintain an action under Section 504, so long as its claim was for expenses "reasonably and foreseeably expended to secure" benefits the defendants were legally obligated to provide. *Id.* Thus, the *Zolin* ruling does not preclude the possibility that Intervenor could recover for the economic damage she reasonably and foreseeably incurred from Forest Dale's refusal to rent an apartment to her husband. The Court notes, though, that these damages would be limited. First, any award of monetary damages under Section 504 requires a finding of intentional discrimination. *See Shinault v. American Airlines, Inc.*, 738 F.Supp. 193, 198 (S.D.Miss.1990), *aff'd in part and rev'd in part*, 936 F.2d 796 (5th Cir.1991). Further, damages under Section 504 are limited to retrospective equitable damages; punitive damages and damages for emotional distress, mental suffering, and the like are not available under Section 504. *See id.* at 198–99.

In sum, the Court concludes that Defendants Motion to Dismiss Intervenor's Complaint is DENIED. Intervenor may pursue her Fair Housing Act claim along with Plaintiff. However, the Court's decision on Intervenor's Rehabilitation Act claim is reserved.

*Intervenor's Motion for Partial Summary Judgment*

Intervenor Louise Cooksey moves for partial summary judgment against Defendants on several questions of law. Most of these issues have been addressed above. To the extent that these matters have been discussed, the Court need not repeat itself. To the extent that matters raised in Intervenor's motion have not been addressed, the Court reserves its decision.

*Third–Party Defendant HUD's Motion to Dismiss*

Third Party Defendant HUD moves to dismiss, or in the alternative for summary judgment on, Defendants' Third–Party Complaint. In that pleading, Defendants seek a declaration from this Court which, in effect, states that Defendants' conduct is lawful. HUD states that the Third–Party Complaint merely rehashes the defenses that Defendants raised in their Answer to the United States' original Complaint. HUD thus claims that Defendants' defenses belong in the original action, not in the additional, third-party declaratory judgment claim Defendants have brought against HUD.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). HUD argues that there is no actual case or controversy between it and Defendants, claiming that the dispute is now only between the United States and Defendants. However, the Court will not pass on this contention, for, even if there is a case and controversy between HUD and Defendants over which the Court has subject matter jurisdiction, the Court declines to exercise its jurisdiction over the Third–Party Action.

It is well settled that the assumption of jurisdiction over a declaratory judgment action is discretionary and that the Court is "under no compulsion to exercise that discretion." *Brillhart v. Excess Insurance Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942); *see also Dresser Indus., Inc. v. Insurance Co. of North America*, 358 F.Supp. 327, 330 (N.D.Tex.) (noting that the Declaratory Judgment Act "gives the court a choice not a command"), *aff'd*, 475 F.2d 1402 (5th Cir.1973). In this case, the issues upon which Defendants seek a declaration are necessarily ones which will be addressed in main action. Thus, the Court finds that Defendants have adequate access to this Court. Hence, the Third–Party action is unnecessary, and the Court declines to exercise its jurisdiction. Third–Party Defendant HUD's Motion to Dismiss is GRANTED.

## IV. Conclusion

Defendants' First Motion for Summary Judgment is DENIED. Defendants' Second Motion for Summary Judgment is also DENIED. Defendants' Motion to Dismiss Intervenor's Complaint is DENIED. Intervenor may pursue her Fair Housing Act Claim, but decision on her Rehabilitation Act claim is reserved. Intervenor's Motion for Summary Judgment is DENIED. Finally, Third–Party Defendant HUD's Motion to Dismiss is GRANTED.

**SO ORDERED.**